(No. 97026.—

# In re COMMITMENT OF STEPHEN E. SIMONS
(The People of the State of Illinois, Appellant, v. Stephen E. Simons, Appellee).

*Opinion filed December 16, 2004.*

Lisa Madigan, Attorney General, of Springfield (Gary Feinerman, Solicitor General, and Linda D. Woloshin, Lionel W. Weaver and Jay Paul Hoffmann, Assistant Attorneys General, of Chicago, of counsel), for the People.

John M. Delaney, Jr., of East Alton, for appellee.

JUSTICE THOMAS delivered the opinion of the court:

Following a bench trial in the circuit court of Madison County, respondent, Stephen Simons, was found to be a sexually violent person under the Sexually Violent Persons Commitment Act (the Act) (725 ILCS 207/1 *et seq.* (West 2002)) and committed to the custody of the Department of Health and Human Services for control, custody, and treatment. Respondent appealed, arguing that the trial court erred in admitting certain expert testimony without first conducting a *Frye* hearing. See *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). The appellate court agreed, reversed the trial court's judgment, and remanded the cause for further proceedings. No. 5—02—0579 (unpublished under Supreme Court Rule 23). We allowed the State's petition for leave to appeal. 177 Ill. 2d R. 315(a).

## BACKGROUND

On February 20, 2001, the State filed a petition to have respondent committed to the Department of Health and Human Services as a sexually violent person. The petition alleged that respondent has a history of committing sexually violent offenses, including a 1988 conviction for the aggravated criminal sexual abuse of a child under the age of 13 and a 1992 conviction for the aggravated criminal sexual assault of a child under the age of 13. In 1996, respondent pleaded guilty to the criminal sexual assault of his 13-year-old stepdaughter and was sentenced to 10 years in prison. In exchange for that guilty plea, the State agreed to dismiss two additional charges of aggravated criminal sexual assault that were pending against respondent, one involving a 13-year-old girl and the other involving a 14-year-old girl. The petition further alleged that respondent was scheduled for release from prison on February 21, 2001, and that he suffers from numerous mental disorders, including paraphilia and antisocial personality disorder, that make it substantially probable that he will again engage in acts of sexual violence.

A bench trial commenced, and respondent filed a motion *in limine* as to the State's two expert witnesses, Dr. Jacqueline N. Buck and Dr. Paul J. Heaton. Dr. Buck and Dr. Heaton are clinical psychologists who evaluated respondent and were prepared to testify that respondent is a sexually violent person as defined by the Act. In support of his motion, respondent argued that, in preparing their opinions, Dr. Buck and Dr. Heaton relied upon certain actuarial risk assessment instruments, including the Minnesota Sex Offender Screening Tool—Revised (MnSOST-R), the Static-99, the Violent Risk Assessment Guide (VRAG), and the Sex Offender Risk Assessment Guide (SORAG). According to respondent, actuarial risk assessment is a novel scientific methodology that has yet to gain general acceptance in the psychological and

psychiatric communities. Accordingly, respondent argued, any expert testimony based upon actuarial risk assessment must be excluded under *Frye*. In response, the State argued that (1) actuarial principles are not the least bit novel and therefore are not subject to *Frye*; and (2) even if the particular actuarial instruments at issue are novel, they have gained general acceptance in the relevant psychological and psychiatric communities. The trial court agreed with the State, denied respondent's motion, and allowed Dr. Buck and Dr. Heaton to testify.

Dr. Buck testified that she is a licensed clinical psychologist employed by the special evaluation unit of the Illinois Department of Corrections (Department). In this capacity, Dr. Buck was assigned to evaluate respondent and determine whether he would be eligible for civil commitment under the Act following his release from prison. Dr. Buck's evaluation began with a review of the master file for each of respondent's several convictions. The master file includes all of the records relating to the particular conviction, including police reports, criminal court records, Department records, and any psychological or psychiatric evaluations. After reviewing the master files, Dr. Buck met with the three other psychologists employed by the Department's special evaluations unit to discuss respondent's case. All four psychologists agreed that respondent appeared to fit the criteria for civil commitment and that a face-to-face interview should be conducted. Dr. Buck interviewed respondent for 90 minutes at the Big Muddy River Correctional Center. Based upon both the interview and her review of respondent's files, Dr. Buck concluded that respondent suffers from paraphilia, alcohol abuse in a controlled environment, and antisocial personality disorder with narcissistic tendencies. According to Dr. Buck, these mental disorders "affect a person's emotional and volitional capacity and predispose that person to engage in acts of sexual violence."

Dr. Buck's evaluation also included an assessment of respondent's probability of reoffending. She first used a personality test called the Hare Psychopathy Checklist—Revised. According to Dr. Buck, respondent scored a 32 on this test, placing him in a category of persons who are two to four times more likely to reoffend with acts of violence.

Dr. Buck then used a number of actuarial risk assessment instruments, including the MnSOST-R, the Static-99, the VRAG, the SORAG, and the Hanson and Bussiere meta-analysis. The MnSOST-R was developed using a group of 256 sex offenders who were followed for six years after their release from the Minnesota Department of Corrections. Dr. Buck gave respondent a score of 13 on the MnSOST-R, which places him in the category of offenders having an 88% chance of reoffending within six years. The Static-99 is based upon a study of thousands of sex offenders from England, Canada, and the United States. According to Dr. Buck, the creators of the Static-99 regard a score of six or higher as being "a very high risk." Dr. Buck gave respondent a score of seven, which places him "in the top twelve percent of persons who were scored on this tool and who sexually reoffended." The VRAG is an instrument designed to predict *violent* reoffenders, as opposed to *sexual* reoffenders. On the VRAG, Dr. Buck gave respondent a score of 20, which places him in the category of offenders having a 55% chance of reoffending within 7 years and a 64% chance of reoffending within 10 years. On the SORAG, which examines the risk of sexual recidivism, Dr. Buck gave respondent a score of 30, "which placed him at the 98th percentile in terms of risk to reoffend." The Hanson and Bussiere meta-analysis was derived from a review of 51 published studies, which collectively covered approximately 28,000 convicted and released sex offenders. The study evaluated more than 100 variables and identified

those that are statistically significant in terms of distinguishing offenders who are likely to sexually reoffend from offenders who are unlikely to sexually reoffend. According to Dr. Buck, respondent "has a number of risk factors that stem from the study."

Dr. Buck concluded her testimony with the opinion that, if respondent is released to the community, it is substantially probable that he will reoffend with additional acts of sexual violence.

Dr. Heaton testified that he is a clinical psychologist employed by Affiliated Psychologists, Ltd., in Chicago, which has contracted with the Illinois Department of Human Services to provide psychological assessments in connection with the Act. Dr. Heaton begins each assessment with a review of all available documents, including the master file, medical records, school records, and psychological evaluations. He then administers a battery of psychological tests, which is followed by a comprehensive clinical interview. Finally, after compiling all of the collected information, as well as any available actuarial data, Dr. Heaton writes his evaluation.

Following his interview with and testing of respondent, Dr. Heaton diagnosed respondent with paraphilia, alcohol abuse, and antisocial personality disorder, all of which affect a person's emotional and volitional capacity and predispose that person to commit acts of sexual violence. Dr. Heaton then employed several actuarial instruments to assess respondent's probability of reoffending. The Hanson and Bussiere meta-analysis identified several risk factors that reinforced his clinical impressions. On the Static-99, Dr. Heaton testified that, although Dr. Buck scored respondent "a little bit higher" than he did, Dr. Heaton's score likewise placed respondent "in the category of individuals who were found to have a high risk of reoffense." On the MnSOST-R, Dr. Heaton gave respondent a score of 13, which placed

respondent "in the range representing a high risk for reoffense." Based upon both his clinical evaluation of respondent and the actuarial data, Dr. Heaton concluded that respondent suffers from mental disorders that predispose him to act in sexually violent ways and that he therefore meets the criteria for commitment under the Act.

At this point, the State rested, and respondent declined to put on any evidence. The trial court found respondent to be a sexually violent person under the Act and committed him to the Department of Health and Human Services for care and treatment in a secured facility.

Respondent appealed, in part arguing that the trial court erred in admitting the testimony of Dr. Buck and Dr. Heaton without first conducting a *Frye* hearing. Relying upon the appellate court's decision in *People v. Taylor*, 335 Ill. App. 3d 965 (2002), the appellate court agreed with respondent, reversed the trial court's judgment, and remanded the cause for further proceedings. No. 5—02—0579 (unpublished under Supreme Court Rule 23). We allowed the State's petition for leave to appeal. 177 Ill. 2d R. 315(a).

## DISCUSSION

Although not raised by the parties, we wish to begin our discussion by clarifying the appropriate standard of review for a trial court's *Frye* rulings.

In Illinois, the admission of expert testimony is governed by the standard first expressed in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). *Donaldson v. Central Illinois Public Service Co.*, 199 Ill. 2d 63, 76-77 (2002). Commonly called the "general acceptance" test, the *Frye* standard dictates that scientific evidence is admissible at trial only if the methodology or scientific principle upon which the opinion is based is "sufficiently established to have gained general acceptance in the particular field in

which it belongs." *Frye*, 293 F. at 1014. In this context, "general acceptance" does not mean universal acceptance, and it does not require that the methodology in question be accepted by unanimity, consensus, or even a majority of experts. *Donaldson*, 199 Ill. 2d at 78. Instead, it is sufficient that the underlying method used to generate an expert's opinion is reasonably relied upon by experts in the relevant field. *Donaldson*, 199 Ill. 2d at 77. Significantly, the *Frye* test applies only to "new" or "novel" scientific methodologies. *Donaldson*, 199 Ill. 2d at 78-79. Generally speaking, a scientific methodology is considered "new" or "novel" if it is " 'original or striking' " or "does 'not resembl[e] something formerly known or used.' " *Donaldson*, 199 Ill. 2d at 79, quoting Webster's Third New International Dictionary 1546 (1993).

Historically, this court has applied an across-the-board abuse of discretion standard when reviewing *Frye* rulings. See, *e.g.*, *Donaldson v. Central Illinois Public Service Co.*, 199 Ill. 2d 63, 76 (2002); *People v. Miller*, 173 Ill. 2d 167, 187 (1996). After careful consideration, we believe that the better approach is that advocated by Chief Justice McMorrow in her *Miller* special concurrence, namely, that reviewing courts may rely upon materials that were not part of the trial record to determine whether a *Frye* hearing is required and, if so, whether the scientific technique at issue is generally accepted in the relevant scientific community. See *Miller*, 173 Ill. 2d at 204 (McMorrow, J., concurring); see also *Donaldson*, 199 Ill. 2d at 104-07 (McMorrow, J., concurring, joined by Garman, J.). Accordingly, we hereby adopt a dual standard of review with respect to the trial court's admission of expert scientific testimony. The decision as to whether an expert scientific witness is qualified to testify in a subject area, and whether the proffered testimony is relevant in a particular case, remains in the

sound discretion of the trial court. The trial court's *Frye* analysis, however, is now subject to *de novo* review. In conducting such *de novo* review, the reviewing court may consider not only the trial court record but also, where appropriate, sources outside the record, including legal and scientific articles, as well as court opinions from other jurisdictions. See *Miller*, 173 Ill. 2d at 203 (McMorrow, J., concurring).

As Chief Justice McMorrow correctly explained in *Miller*, allowing for *de novo* review in this context makes sense for several reasons, foremost of which "is the fact that the general acceptance issue transcends any particular dispute." See *Miller*, 173 Ill. 2d at 204 (McMorrow, J., concurring). Indeed, " '[t]he question of general acceptance of a scientific technique, while referring to only one of the criteria for admissibility of expert testimony, in another sense transcends that particular inquiry, for, in attempting to establish such general acceptance for purposes of the case at hand, the proponent will also be asking the court to establish the law of the jurisdiction for future cases.' " *Miller*, 173 Ill. 2d at 204 (McMorrow, J., concurring), quoting *Jones v. United States*, 548 A.2d 35, 40 (D.C. App. 1988). Application of less than a *de novo* standard of review to an issue that transcends individual cases invariably leads to inconsistent treatment of similarly situated claims. See *Miller*, 173 Ill. 2d at 204-05 (McMorrow, J., concurring). Because "[t]he general acceptance of a scientific technique does not change from one courtroom to another," the legal assessment of that general acceptance should not change from court to court either. *Miller*, 173 Ill. 2d at 205 (McMorrow, J., concurring).

In addition, Chief Justice McMorrow correctly noted that a *de novo* standard that permits reliance on materials outside the trial record is not, in this context, problematic. See *Miller*, 173 Ill. 2d at 205 (McMorrow, J.,

concurring). Under the *Frye* standard, the trial court is not asked to determine the validity of a particular scientific technique. Rather, the court's responsibility is to determine the existence, or nonexistence, of general consensus in the relevant scientific community regarding the reliability of that technique. " 'Accordingly, because the focus is primarily on counting scientists' votes, rather than on verifying the soundness of a scientific conclusion, there will not be the concerns about witness credibility and hearsay normally associated with citations to empirical or scientific studies whose authors cannot be observed or cross-examined.' " *Miller*, 173 Ill. 2d at 205 (McMorrow, J., concurring), quoting *Jones*, 548 A.2d at 42.

Significantly, this court in both *Donaldson* and *Miller* implicitly acknowledged the utility of the *de novo* standard in the *Frye* context, even when purporting to apply an abuse of discretion standard. In both of those cases, this court went outside the trial court record to assess the validity of the trial court's *Frye* ruling. In *Miller*, for example, the court expressly relied upon numerous court decisions and journal articles that had been published "[s]ince the time of the pretrial hearing." *Miller*, 173 Ill. 2d at 189. In *Donaldson*, the court had to go outside the record to ascertain the very definition of the scientific principle at issue. *Donaldson*, 199 Ill. 2d at 82 n.2. Thus, today's decision to formally endorse a *de novo* standard for *Frye* rulings is not so much a departure from this court's existing analytical framework as it is a recognition of the analytical framework under which this court has been operating for sometime, albeit under the wrong name.

Finally, we note that several other state supreme courts employ a *de novo* standard when reviewing *Frye* rulings. See, *e.g.*, *State v. Tankersley*, 191 Ariz. 359, 365, 956 P.2d 486, 492 (1998); *Castillo v. E.I. Du Pont*

*De Nemours & Co.*, 854 So. 2d 1264, 1268 (Fla. 2003); *State v. Shively*, 268 Kan. 573, 576, 999 P.2d 952, 955 (2000); *Wilson v. State*, 370 Md. 191, 201 n.5, 803 A.2d 1034, 1040 n.5 (2002); *State v. Bailey*, 677 N.W.2d 380, 398 (Minn. 2004); *State v. Harvey*, 151 N.J. 117, 167, 699 A.2d 596, 619 (1997); *State v. Gore*, 143 Wash. 2d 288, 304, 21 P.3d 262, 271 (2001).

Turning now to the case at hand, we are asked to decide whether actuarial risk assessment, as utilized by Dr. Buck and Dr. Heaton, is admissible under *Frye*. The appellate court is sharply divided on this question. One view is represented by *People v. Taylor*, 335 Ill. App. 3d 965 (2002). In *Taylor*, as in the present case, the trial court held that the actuarial instruments at issue, including the MnSOST-R and the Static-99, were *not* scientific methodologies subject to *Frye*. *Taylor*, 335 Ill. App. 3d at 972. In reversing, the Second District of the appellate court first stated:

> "Whether these tools are viewed as psychological tests or actuarial instruments, they certainly constitute a scientific methodology for predicting sexual offender recidivism. As such a methodology has yet to be adopted in a court proceeding in Illinois, the State was obligated to show that these instruments have gained acceptance in the relevant scientific community as required under *Frye*." *Taylor*, 335 Ill. App. 3d at 977.

The next question became whether the State had met its burden of proving that actuarial risk assessment has gained general acceptance in the psychological and psychiatric communities. *Taylor*, 335 Ill. App. 3d at 977. The court held that it had not. Although the court conceded that "many psychologists and psychiatrists utilize these instruments to predict whether a sexual offender is likely to reoffend," the court remained convinced that "the instruments are still in the experimental stages and that the validity of these instruments has not been established." *Taylor*, 335 Ill. App. 3d at 978. The

court was most concerned about the absence of published peer-reviewed studies concerning the validity of these instruments, as such studies "are important steps in the acceptance of a new methodology by the psychological community." *Taylor*, 335 Ill. App. 3d at 978.

The opposite view is represented by *In re Detention of Erbe*, 344 Ill. App. 3d 350 (2003), in which the Fourth District held that (1) actuarial risk assessment is not a novel scientific method subject to *Frye*, and (2) even if it is, it meets the general acceptance test. In *Erbe*, the court methodically examined each step of the *Frye* inquiry, concluding at each step that testimony based upon actuarial risk assessment is admissible. First, the court held that actuarial instruments such as the MnSOST-R, the Static-99, and the VRAG "do not purport to involve a scientific principle, method, or test to which *Frye* applies." *Erbe*, 344 Ill. App. 3d at 364. Rather, these instruments " 'are simply actuarial tables—methods of organizing and interpreting a collection of historical data.' " *Erbe*, 344 Ill. App. 3d at 364, quoting *In re Commitment of R.S.*, 339 N.J. Super. 507, 540, 773 A.2d 72, 92 (2001), *aff'd*, 173 N.J. 134, 801 A.2d 219 (2002). The court then explained that, even if actuarial risk assessment *does* constitute a scientific methodology, it still is not subject to *Frye* because actuarial science is not the least bit "new" or "novel." *Erbe*, 344 Ill. App. 3d at 365. According to the court, "[o]ur society uses actuarial methods to predict human behavior all the time," particularly in relation to liability insurance and economics. *Erbe*, 344 Ill. App. 3d at 366. Moreover, the court cited a study showing that, as early as 1928, the State of Illinois was using actuarial data to predict recidivism. *Erbe*, 344 Ill. App. 3d at 366, citing W. Grove & P. Meehl, *Comparative Efficiency of Informal (Subjective, Impressionistic) and Formal (Mechanical, Algorithmic) Prediction Procedures: The Clinical-Statistical Controversy*, 2 Psychol. Pub. Pol'y

& L. 293, 293 (1996). Finally, the court held that, even assuming that *Frye* applies, actuarial risk assessment is generally accepted by professionals who assess sex offenders for risk of reoffending. *Erbe*, 344 Ill. App. 3d at 367. The court emphasized that, of the numerous appellate decisions nationwide addressing the admissibility of actuarial instruments such as the MnSOST-R and the Static-99, only *Taylor* found them inadmissible. *Erbe*, 344 Ill. App. 3d at 368-72.

After careful consideration, we emphatically agree with *Erbe*'s conclusion that, whether or not actuarial risk assessment is subject to *Frye*, there is no question that it is generally accepted by professionals who assess sexually violent offenders and therefore is perfectly admissible in a court of law. As of this writing, experts in at least 19 other states rely upon actuarial risk assessment in forming their opinions on sex offenders' risks of recidivism. See *State ex rel. Romley v. Fields*, 201 Ariz. 321, 328, 35 P.3d 82, 89 (2001); *People v. Therrian*, 113 Cal. App. 4th 609, 614-16, 6 Cal. Rptr. 3d 415, 419-20 (2003); *Roeling v. State*, 880 So. 2d 1234, 1238-40 (Fla. App. 2004); *In re Detention of Holtz*, 653 N.W.2d 613, 619 (Iowa App. 2002); *In re Care & Treatment of Teer*, No. 89,652, slip op. at 3-4 (Kan. App. 2004) (unpublished order); *Commonwealth v. Wright*, No. 032449A, slip op. at 1 (Mass. Super. 2004); *In re Risk Level Determination of R.B.P.*, 640 N.W.2d 351, 353-56 (Minn. App. 2002); *Goddard v. State*, No. 25779, slip op. at 5 (Mo. App. 2004); *State v. Legg*, 319 Mont. 362, 366, 84 P.3d 648, 651 (2004); *Slansky v. Nebraska State Patrol*, 268 Neb. 360, 370-75, 685 N.W.2d 335, 345-49 (2004); *In re Commitment of R.S.*, 173 N.J. 134, 136-37, 801 A.2d 219, 220-21 (2002); *People v. Girup*, 9 A.D.3d 913, 780 N.Y.S.2d 698 (2004) (mem. op.); *In re D.V.A.*, 676 N.W.2d 776, 778-80 (N.D. 2004); *State v. McKinnis*, 153 Ohio App. 3d 654, 661-62, 795 N.E.2d 160, 165-66 (2003); *State v. Gibson*, 187 Or. App.

207, 214, 66 P.3d 560, 564-65 (2003); *In re Care & Treatment of Tucker*, 353 S.C. 466, 469, 578 S.E.2d 719, 721 (2003); *In re Commitment of Morales*, 98 S.W.3d 288, 291 (Tex. Ct. App. 2003); *In re Detention of Thorell*, 149 Wash. 2d 724, 753-56, 72 P.2d 708, 724-25 (2003); *In re Commitment of Tainter*, 259 Wis. 2d 387, 399, 655 N.W.2d 538, 544 (2002).

Significantly, eight of these states have directly addressed the *Frye* question and concluded either that *Frye* is inapplicable to actuarial risk assessment or that actuarial risk assessment satisfies the general acceptance standard. See *Romley*, 201 Ariz. at 328, 35 P.3d at 89 (*Frye* not applicable); *Therrian*, 113 Cal. App. 4th at 614-16, 6 Cal. Rptr. 3d at 419-20 (*Frye* not applicable); *Roeling*, 880 So. 2d at 1238-40 (general acceptance standard met); *Holtz*, 653 N.W.2d at 619 (general acceptance test met); *Goddard*, slip op. at 5 (general acceptance test met); *R.S.*, 173 N.J. at 136-37, 801 A.2d at 220-21 (general acceptance test met); *Thorell*, 149 Wash. 2d at 753-56, 72 P.2d at 724-25 (general acceptance test met); *Tainter*, 259 Wis. 2d at 399, 655 N.W.2d at 544 (general acceptance test met). It is also worth noting that actuarial risk assessment is not exclusively an instrument of the State; experts for the offender rely upon it as well. See, *e.g.*, *People v. Calhoun*, 118 Cal. App. 4th 519, 522-23, 13 Cal. Rptr. 3d 166, 168 (2004); *In re Detention of Walker*, 314 Ill. App. 3d 282, 290 (2000) (according to respondent's expert, "the research is very clear in stating that the most accurate predictions of the risk of future offenses are those based upon actuarial assessments of probability"); *Legg*, 319 Mont. at 366, 84 P.3d at 651; *State v. Purser*, 153 Ohio App. 3d 144, 150-53, 791 N.E.2d 1053, 1057-59 (2003); *McKinnis*, 153 Ohio App. 3d at 661-62, 795 N.E.2d at 165-66; *Zimmer v. State*, No. 05—03—01253—CR, slip op. at 2 (Tex. App. 2004) (unpublished order).

We recognize, of course, that "relying exclusively upon prior judicial decisions to establish general scientific acceptance can be a ' "hollow ritual" ' if the underlying issue of scientific acceptance has not been adequately litigated." *People v. Basler*, 193 Ill. 2d 545, 554 (2000) (McMorrow, J., dissenting), quoting *People v. Kirk*, 289 Ill. App. 3d 326, 333 (1997), quoting 1 J. Strong, McCormick on Evidence § 203, at 870 n.20 (4th ed. 1992). This is not a concern here, however, as the general acceptance of actuarial risk assessment has been thoroughly litigated in several states, as several of the above citations illustrate. In *Roeling*, for example, the court began by examining the testimony of the four expert psychologists who testified at trial:

"All of the experts except the one offered by appellant testified that they use such instruments on a regular basis; that they are generally accepted among forensic clinical psychologists who evaluate persons alleged to be sexually violent predators, provided they are used in conjunction with a clinical assessment (as those testifying in appellant's case did); and that the use of risk-assessment instruments in conjunction with a clinical assessment was a superior method of evaluating an individual to reliance on a clinical assessment alone. Even appellant's expert conceded that such instruments were being used 'with great frequency by people doing these evaluations'; and that an evaluation based on only a clinical assessment would at best be equal to (but no better than) a pure actuarial approach." *Roeling*, 880 So. 2d at 1239.

Next, the court exhaustively examined the academic literature, which confirms that "[t]he opinions relied upon by the trial court are *** consistent with conclusions reached by a number of other psychologists, including those who have developed the actuarial tools and conducted cross-validation and meta-analyses to confirm their reliability." *Roeling*, 880 So. 2d at 1239, citing J. Becker & W. Murphy, *What We Know and Do Not Know About Assessing and Treating Sex Offenders*, 4 Psychol.

Pub. Pol'y & L. 116 (1998); D. Epperson, *Cross-Validation of the Minnesota Sex Offender Screening Tool-Revised,* ATSA Presentation, San Diego, CA (November 3, 2000); M. Grann, *Actuarial Assessment of Risk for Violence: Predictive Validity of the VRAG and the Historical Part of the HCR-20,* 27 Crim. Just. & Behav. 97 (2000); W. Grove & P. Meehl, *Comparative Efficiency of Informal (Subjective, Impressionistic) and Formal (Mechanical, Algorithmic) Prediction Procedures: The Clinical-Statistical Controversy,* 2 Psychol. Pub. Pol'y & L. 293 (1996); R. Hanson, *What Do We Know About Sex Offender Risk Assessment?,* 4 Psychol. Pub. Pol'y & L. 50 (1998); R. Hanson & D. Thornton, *Improving Risk Assessments for Sex Offenders: A Comparison of Three Actuarial Scales,* 24 L. & Hum. Behav. 119 (2000); R. Hanson & M. Bussiere, *Predicting Relapse: A Meta-Analysis of Sexual Offender Recidivism Studies,* 66 J. of Consulting & Clinical Psychol. 348 (1998); R. Hanson & A. Harris, *Where Should We Intervene?: Dynamic Predictors of Sexual Offense Recidivism,* 27 Crim. Just. & Behav. 6 (2000); R. Hare, *Psychopathy and the Predictive Validity of the PCL-R: An International Perspective,* 18 Behav. Sci. & L. 623 (2000); G. Harris, *Appraisal and Management of Risk in Sexual Aggressors: Implications for Criminal Justice Policy,* 4 Psychol. Pub. Pol'y & L. 73 (1998); M. Rice & G. Harris, *Cross-Validation and Extension of the Violence Risk Appraisal Guide for Child Molesters and Rapists,* 21 L. & Hum. Behav. 231 (1997). Lastly, the court surveyed the nationwide jurisprudence concerning the admissibility of expert testimony based in part upon the use of actuarial risk assessment. According to the court:

> "Not one court has held such testimony inadmissible as a matter of law. Rather, the debate has been over whether the testimony must pass the *Frye* test." *Roeling,* 880 So. 2d at 1239.

Based on all of this information, the court ultimately concluded that "expert opinion testimony regarding

propensity to commit acts of sexual violence in the future which is based in part on use of the [RRASOR, Static-99 and MnSOST-R] risk-assessment instruments" satisfies the *Frye* test. *Roeling*, 880 So. 2d at 1239.[1]

As importantly, we were unable to identify any state outside of Illinois in which expert testimony based upon actuarial risk assessment was deemed inadmissible on the question of sex offender recidivism. In fact, in several jurisdictions actuarial risk assessment is mandated by either statute or regulation. In New York, for example, the Sex Offender Registration Act creates the Board of Examiners of Sex Offenders (the Board), which is charged with developing "guidelines and procedures to assess the risk of a repeat offense by [sex offenders] and the threat posed to the public safety." N.Y. Correct. Law §§ 168—l(1), (5) (McKinney 2003). Such guidelines must be based upon certain risk factors specifically defined by the legislature. N.Y. Correct. Law § 168—l(5) (McKinney 2003). In response to this mandate, the Board created an objective risk assessment instrument, which considers 15 risk factors and assigns a numerical value to the existence of certain circumstances regarding each specified factor. See *People v. Salaam*, 174 Misc. 2d 726, 729-30, 666 N.Y.S.2d 881, 883-84 (N.Y. Sup. Ct. 1997) (discussing history of the risk assessment instrument). These values are then totaled to arrive at the offender's presumptive risk level. *Salaam*, 174 Misc. 2d at 729-30, 666 N.Y.S.2d at 883-84. Where the total score is 70 points or less, the offender is presumptively level one (low risk); more than 70 points but less than 110 points, he is presumptively

---

[1]Similarly thorough analyses can be found in the following decisions, all of which rely upon some combination of expert testimony, academic literature, and the nationwide jurisprudential consensus that clearly exists on this question: *Holtz*, 653 N.W.2d at 619; *Erbe*, 344 Ill. App. 3d at 364-72; *Goddard*, slip op. at 5; *R.S.*, 173 N.J. at 136-37, 801 A.2d at 220-21; *Thorell*, 149 Wash. 2d at 753-56, 72 P.2d at 724-25.

level two (moderate risk); and if 110 points or more, he is presumptively level three (high risk). *Salaam*, 174 Misc. 2d at 729-30, 666 N.Y.S.2d at 883-84. Prior to the release of a convicted sex offender, a member of the Board calculates the offender's presumptive risk level and makes a recommendation to the original sentencing court. N.Y. Correct. Law § 168—l(6) (McKinney 2003). The court then holds a risk assessment hearing to determine the offender's actual risk level, taking into the account the Board's recommendation as well as any additional evidence or testimony submitted by the parties. N.Y. Correct. Law § 168—n (McKinney 2003).

A similar scheme exists in Minnesota, where the Sex Offender Community Notification Act (the Notification Act) directs the commissioner of corrections to create "end-of-confinement review committees" at each state facility where predatory offenders are confined. Minn. Stat. § 244.052(3) (2004). The purpose of these committees is to "assess on a case-by-case basis the public risk posed by predatory offenders who are about to be released from confinement." Minn. Stat. § 244.052(3) (2004). To assist the committees in discharging this mandate, the Notification Act also directed the commissioner of corrections to develop, by January 1, 1997, "a risk assessment scale which assigns weights to *** various risk factors *** and specifies the risk level to which offenders with various risk assessment scores shall be assigned." Minn. Stat. § 244.052(2) (2004). The commissioner did so, and the result is the MnSOST-R. *In re Risk Level Determination of R.B.P.*, 640 N.W.2d at 354. Using the MnSOST-R, the end-of-confinement review committees are statutorily required to assess predatory offenders who are about to be released from confinement and "determine the offender's risk assessment score and risk level." Minn. Stat. § 244.052(3)(d)(i) (2004). An offender's risk level, which is subject to administrative

review, ultimately determines the level of community notification that is required under the Notification Act. Minn. Stat. §§ 244.052(4)(b), (6) (2004).[2]

Finally, we note that the academic literature contains many articles confirming the general acceptance of actuarial risk assessment by professionals who assess sexually violent offenders for risk of recidivism. In one article, the authors maintain that actuarial risk assessment "is a state-of-the-art technique, and courts should insist that it be employed as a major instrument of risk

---

[2]Other states that mandate the use of actuarial risk assessment include Alabama (Ala. Code § 12—25—33(6) (2004) (directing sentencing commission to develop risk assessment instrument based on a study of Alabama felons)); Colorado (Colo. Rev. Stat. § 18—3—414.5(1)(a)(IV) (2004) (defining "sexually violent predator" in terms of offender's results on risk assessment screening instrument)); Florida (Fla. Admin. Code R. 65E—25.001(2)(b) (2004) (mandating use of Static-99 in sexually violent predator evaluations)); Nebraska (Neb. Admin. Rs. & Regs. tit. 272, ch. 19, §§ 013.02, 013.07 (2004) (creating sex offender risk assessment instrument)); Nevada (Nev. Rev. Stat. Ann. §§ 179D.720(1), (2) (Lexis 2001) (directing attorney general to establish factor-based guidelines for assessing risk of sex offender recidivism)); New Jersey (N.J. Rev. Stat. § 2C:7—8(a) (2004) (directing attorney general to develop factor-based procedures for assessing risk of sex offender recidivism)); New Mexico (N.M. Stat. Ann. § 9—3—13(D)(4) (Michie 2004) (directing sex offender management board to create a risk assessment screening tool)); Oregon (Or. Admin. R. 255—060—0011 (2004) (mandating use of Static-99 in predatory sex offender evaluations)); Rhode Island (R.I. Gen. Laws § 11—37.1—6(1)(b) (Supp. 2003) (directing sex offender board of review to use a "validated risk assessment instrument" in sexually violent predator evaluations)); Texas (Tex. Crim. Proc. Code Ann. art. 62.035 (West Supp. 2004) (directing risk assessment review committee to "develop or select from among existing tools a sex offender screening tool")); and Virginia (Va. Code Ann. § 37.1—70.4(C) (Lexis Supp. 2004) (directing department of corrections to evaluate sexually violent offenders using either the Rapid Risk Assessment for Sexual Offender Recidivism or "a comparable, scientifically validated instrument")).

assessment." E. Janus & R. Prentky, *Forensic Use of Actuarial Risk Assessment with Sex Offenders: Accuracy, Admissibility and Accountability*, 40 Am. Crim. L. Rev. 1443, 1445 (2003). This same article notes that "[r]espected researchers urge the 'complete replacement of existing practice with actuarial methods,' and suggest that the use of clinical methods, where actuarial ones are available, would be 'unethical.' " 40 Am. Crim. L. Rev. at 1485, quoting V. Quinsey, Violent Offenders: Appraising and Managing Risk 171 (1998); W. Grove & P. Meehl, *Comparative Efficiency of Informal (Subjective, Impressionistic) and Formal (Mechanical, Algorithmic) Prediction Procedures: The Clinical-Statistical Controversy*, 2 Psychol. Pub. Pol'y & L. 293, 320 (1996). The authors go on to explain:

> "The principle of actuarial superiority is not novel. \*\*\* It has been tested extensively, and has broad acceptance in the literature, both in general, and in the specific literature concerning sexual offending. Similarly, the science underlying ARA is not new. Statistical decision theory and its application to human judgment have been around for fifty years. The same methodology has been applied in numerous, diverse contexts, including weather forecasting, law school admissions, disability determinations, predicting the quality of the vintage for red Bordeaux wines, and predicting the quality of sound in opera houses." 40 Am. Crim. L. Rev. at 1486.

Ultimately, the authors conclude that "[risk] assessments should be conducted in the most scientifically credible and reliable fashion possible" and that "[t]he weight of the evidence points to the superiority of actuarial assessment of risk over clinical assessment of risk." 40 Am. Crim. L. Rev. at 1498.

In another article, a board certified forensic and clinical psychologist describes actuarial risk assessment as "a quantum leap" in the science of violence risk analysis, noting that a combination of actuarial and clinical methods "is commonly advocated by leading forensic

practitioners who routinely predict violence in the course of their forensic work." C. Mee & H. Hall, *Risky Business: Assessing Dangerousness in Hawaii*, 24 U. of Haw. L. Rev. 63, 92 (2001). Another forensic psychologist writes that "overall research has increasingly revealed that actuarial risk instruments *** exhibit more predictive reliability and validity than the clinical judgment of psychologists and psychiatrists alone" and that "[i]n a wide variety of medical and social science studies, actuarial assessments consistently meet or surpass the accuracy of clinical assessments." J. Fabian, *Kansas v. Hendricks, Crane and Beyond: "Mental Abnormality," and "Sexual Dangerousness": Volitional vs. Emotional Abnormality and the Debate Between Community Safety and Civil Liberties*, 29 Wm. Mitchell L. Rev. 1367, 1434 (2003), citing N. Hilton & J. Simmons, *The Influence of Actuarial Risk Assessment in Clinical Judgments in Tribunal Decisions about Mentally Disordered Offenders in Maximum Security*, 25 L. & Hum. Behav. 394 (2001). More recently, the Static-99's creators, R. Karl Hanson and David Thornton, wrote that "Static-99 *** has been widely adopted as a measure of sex offense recidivism risk, with routine applications in jurisdictions as diverse as Sweden, Texas, and Taiwan." R. Hanson & D. Thornton, *Notes on the Development of Static-2002, User Report No. 2003-01*, Department of the Solicitor General of Canada (2003).

Taking all of this together—the case law, the statutory law, and the academic literature—we are more than convinced that actuarial risk assessment has gained general acceptance in the psychological and psychiatric communities. We therefore hold that the trial court properly admitted the expert testimony of Dr. Buck and Dr. Heaton, which relied in part upon actuarial risk assessment.

## CONCLUSION

For the foregoing reasons, the judgment of the appel-

late court is reversed, and the judgment of the circuit court is affirmed.

> *Appellate court judgment reversed;*
> *circuit court judgment affirmed.*

JUSTICE KARMEIER took no part in the consideration or decision of this case.

JUSTICE FREEMAN, dissenting:

I cannot join the majority's disposition of this case. The majority decides this case entirely on issues the parties did not brief, and ignores the doctrine of *stare decisis* in doing so.

Much of the evidence against defendant in the civil commitment proceeding against him was based on "actuarial risk assessment." Defendant filed a motion *in limine* arguing that this was a novel methodology, which the circuit court should not admit without holding a *Frye* hearing. The State maintained that no *Frye* hearing was required, because "actuarial principles" are not novel. Alternatively, the State argued that even if actuarial risk assessment was novel, it satisfied the *Frye* requirement of general acceptance. The circuit court agreed with the State that no *Frye* hearing was required and did not rule on the State's alternate argument that actuarial risk assessment passed the *Frye* test. The appellate court reversed, holding that the circuit court erred in failing to hold a *Frye* hearing.

In reversing the appellate court, the majority forthrightly admits that the first issue discussed is one "not raised by the parties," that is, "the appropriate standard of review for a trial court's *Frye* rulings." 213 Ill. 2d at 529. Initially, this court in general ought to be wary of addressing issues *sua sponte*, without the benefit of briefing by the parties. In the instant case the State affirmatively *relies* on the unquestioned assumption that the standard of review is "abuse of discretion," and

defendant does not dispute that this is the proper standard. Nor can one fault the parties for failing to argue the standard of review, given this court's unambiguous recent statement that "We review *Frye* issues under an abuse of discretion standard." *Donaldson v. Central Illinois Public Service Co.*, 199 Ill. 2d 63, 76 (2002). See also *People v. Miller*, 173 Ill. 2d 167, 187-88 (1996) ("The decision of whether to admit expert testimony about a new scientific technique is committed to the sound discretion of the trial court *** the trial court did not abuse its discretion").

Given the fact that the standard of review has not been put into issue by the parties, I am troubled by the court's decision to interject the issue on its own. The majority does not explain its decision to do so, but certainly the importance of the issue cannot be the rationale, as a case is sure to come up in the future in which the parties actually address the subject. See *People v. De La Paz*, 204 Ill. 2d 426, 453 (2003) (Thomas, J., concurring) ("the majority is being disingenuous if it is suggesting that the importance of the issue mandates that we resolve it in this particular case"). And the doctrine of *stare decisis* compels an opposite approach. According to this doctrine, " 'absent powerful countervailing considerations, like cases ought to be decided alike.' " *People v. Tisdel*, 201 Ill. 2d 210, 228 (2002) (McMorrow, J., dissenting, joined by Freeman and Kilbride, JJ.), quoting 5 Am. Jur. 2d *Appellate Review* § 599 (1995). Not only do we address the standard of review without the parties even having mentioned it, we reverse our own recent precedent without even so much as an acknowledgment of *stare decisis*. This is perplexing, to say the least. It would be one thing if the majority and I differed on the question of whether there is cause to overcome the doctrine of *stare decisis* in this particular case. Certainly there are occasions on which there exists

sufficient reason to overturn prior precedent, notwithstanding the doctrine (see, *e.g.*, *People v. Coleman*, 183 Ill. 2d 366, 378-89 (1998) (changing standard of review of dismissals of petitions under Post-Conviction Hearing Act)), and whether sufficient reason exists for a departure from *stare decisis* in any given case is a question upon which reasonable minds might sometimes differ. But the majority fails even to admit that the doctrine exists.

This cannot be because the majority is unaware of the doctrine. Dissenting members of this court have taken pains to remind majorities of the doctrine's existence in recent case law—including cases authored by the very justice who writes for the majority in the instant case. See, *e.g.*, *Tisdel*, 201 Ill. 2d at 227 (McMorrow, J., dissenting, joined by Freeman and Kilbride, JJ.) ("the majority opinion is notable for its complete silence with respect to the application of the principle of *stare decisis* while overturning two recent and unanimous decisions of this court"). Thus, I confess, I find myself utterly perplexed by the majority's failure even to acknowledge the doctrine's existence in the instant case. The dissonance is especially striking, given that the author of the majority opinion in the instant case was a member of the *Donaldson majority*, and did not join the two specially concurring justices in that case who called for *de novo* review of *Frye* "general acceptance" determinations. See *Donaldson*, 199 Ill. 2d at 104 (McMorrow, J., concurring, joined by Garman, J.). Why does this case represent an exception to the principle, embodied in the doctrine of *stare decisis*, that the laws of Illinois ought not to change whenever individual justices of this court change their minds? See *Tisdel*, 201 Ill. 2d at 228 (McMorrow, J., dissenting, joined by Freeman and Kilbride, JJ.) ("*stare decisis* 'is the means by which courts ensure that the law will not merely change erratically, but will develop in a principled and intelligible fashion *** [apart from] the

proclivities of individuals' "), quoting *Chicago Bar Ass'n v. Illinois State Board of Elections*, 161 Ill. 2d 502, 510 (1994). The majority is silent on this subject. I am concerned that by failing to address the issue, the majority leaves this court open to the charge that Illinois is governed no longer by law, but by the vagaries of the day-to-day preferences of the members of this court.

After having changed Illinois law *sua sponte*, the majority goes on to frame the issue as "whether actuarial risk assessment *** is admissible under *Frye*." 213 Ill. 2d at 533. With all due respect to the majority, that is not the question before us. The question is whether the circuit court erred in failing to hold any *Frye* hearing at all. The circuit court found that no *Frye* hearing was required, and the appellate court disagreed—but neither court ever determined whether actuarial risk assessment is admissible under the *Frye* test.

The majority sidesteps the question of whether actuarial risk assessment is subject to *Frye*, the only question decided by the lower courts. Instead, the majority implicitly determines that the answer to this question is irrelevant, because actuarial risk assessment satisfies the *Frye* test. I note that this *ratio decendi* is only possible because of the earlier change to the standard of review. If the standard of review is abuse of discretion, as the parties assume and as this court has held as recently as two years ago, we would have to determine whether actuarial risk assessment is subject to *Frye*. If it is not subject to *Frye*, we would affirm. But if it *is* subject to *Frye*, there would be no possible conclusion other than that circuit court abused its discretion in failing to hold a *Frye* hearing, as there is no *Frye*-related evidence we could review to affirm the circuit court's conclusion—I note that in determining that actuarial risk assessment passes the *Frye* test, the majority relies wholly on materials which the circuit court never considered.

I state no opinion on whether actuarial risk assessment ought to pass the *Frye* test in an appropriate case. I simply believe that this is not the proper case to decide the issue, given the tortuous path down which the majority propels Illinois law in doing so.

JUSTICE KILBRIDE joins in this dissent.