NOTICE

Decision filed 06/25/10. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

NO. 5-09-0019

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | |
|---|---|
| *In re* DETENTION OF HARRY CAIN | ) Appeal from the |
| | ) Circuit Court of |
| (The People of the State of Illinois, | ) Christian County. |
| | ) |
| Petitioner-Appellee, | ) |
| | ) |
| v. | ) No. 98-MR-60 |
| | ) |
| Harry Cain, | ) Honorable |
| | ) Michael D. McHaney, |
| Respondent-Appellant). | ) Judge, presiding. |

_____

JUSTICE WEXSTTEN delivered the opinion of the court:

The respondent, Harry Cain, appeals from the circuit court's denial of his petition for discharge or conditional release from his commitment as a sexually violent person pursuant to the Sexually Violent Persons Commitment Act (the Act) (725 ILCS 207/1 *et seq.* (West 2006)). For the reasons that follow, we affirm.

BACKGROUND

In 1999, the respondent was adjudicated a sexually violent person pursuant to the Act and was committed to the Department of Human Services for control, care, and treatment. See 725 ILCS 207/1 *et seq.* (West 1998). Since then, he has repeatedly sought a discharge or conditional release from his commitment, and on each occasion, his requested relief has been denied. *In re Detention of Cain*, No. 5-05-0702 (2006) (unpublished order under Supreme Court Rule 23 (166 Ill. 2d R. 23)); *In re Detention of Cain*, No. 5-04-0431 (2005) (unpublished Rule 23 order); *In re Detention of Cain*, 341 Ill. App. 3d 480 (2003); *In re Detention of Cain*, No. 5-01-0083 (2003) (unpublished Rule 23 order); *In re Detention of*

1

*Cain*, No. 5-99-0197 (2000) (unpublished Rule 23 order). In 2007, the respondent filed the petition for discharge or conditional release that is the subject of the present appeal. In 2008, the circuit court denied the respondent's petition after a probable cause hearing. The relevant items of evidence that the court considered at the hearing were psychological reexamination reports prepared by the State's psychologist, Dr. Raymond Wood, and a psychological evaluation report prepared by the respondent's appointed expert, Dr. Kirk Witherspoon.

### Dr. Wood's Findings

In his reports, Dr. Wood indicated that when preparing his most recent evaluations of the respondent, he had reviewed numerous sources of information, including the respondent's past treatment records. Wood further indicated that he had evaluated or examined the respondent on multiple occasions since 2005. Wood's findings included the following.

In 1988, when the respondent was 52, he was charged with aggravated criminal sexual abuse, aggravated criminal sexual assault, and permitting the sexual abuse of a child. The victims of the charged offenses were a 4-year-old girl and her two brothers, who were 8 and 12. The charges ultimately led to the respondent's incarceration, and in 1992, he was paroled. Following his release from prison, he "sporadically attended" sex-offender treatment for six months. In 1996, the respondent was charged with sexually abusing a nine-year-old boy, and he was released from prison on that offense in 1998. While incarcerated, he was referred to, but did not enter, sex-offender treatment. "His records indicate[] *** that seven other children reported incidents of sexual abuse or attempted sexual abuse that did not result in criminal charges."

In 1999, the respondent was committed pursuant to the Act. In June 2000, he entered a multifaceted treatment program at his commitment facility, but he withdrew from the program in January 2001. The respondent reentered the program in June 2002 but "was

2

suspended for non[]attendance in November 2002." He was subsequently removed from the program in January 2003. The respondent later "provided several justifications for not participating in [the treatment program]," and he blamed his therapists for his decision to withdraw in 2001. Wood indicated that treatment refusal was a perpetual problem with the respondent. Wood explained that the treatment program's goals included relapse prevention and cognitive restructuring, and one of its component phases required the respondent to fully disclose and accept responsibility for all of his past sex offenses. While in treatment, when questioned about "additional, undisclosed victims," the respondent "irrationally" interpreted the questions as suggesting that he should lie and fabricate the existence of victims that did not exist. Before his removal from treatment in 2003, however, the respondent admitted that he had committed sexual offenses against nine victims.

Wood indicated that during self-report assessments conducted while the respondent was in treatment, the respondent had provided untruthful responses regarding his sexual interests and attitudes. The respondent also suggested that his offenses against children were not as serious as reported. When interviewed in 2007, the respondent stated, *inter alia*, that "some women secretly want to be raped" and that a woman " 'could prevent rape if she wanted to.' " The respondent also stated that "children could be seductive" by " 'the movements they make.' " He indicated that he no longer had a sex drive, however, and that his self-estimated risk of recidivism was less than 10%.

Based on his review of the respondent's records and assessments, and consistent with previous evaluations, Wood diagnosed the respondent with pedophilia towards both males and females and a personality disorder with antisocial traits. Wood also utilized actuarial assessments to determine the likelihood that the respondent might commit further sex offenses if released. The respondent was designated a moderate-high risk using the Static-99 assessment and a high risk using the MnSOST-R. Wood explained that those assessments

3

are "conservative and underestimate actual risk" and that the respondent's personality disorder was an additional risk factor. The respondent's low motivation for treatment, his lack of remorse and victim-blaming, his tolerant attitude toward sex crimes, and his sexual interests in children were also noted as additional risk factors.

Acknowledging that some research suggested that recidivism rates among sex offenders decrease with age and that "actuarial risk estimates for sex offenders 60 or more years old overestimate their actual risk," Wood explained that those considerations needed "to be viewed within the context of [the respondent's] risk when he committed his predicate offense." Wood further explained that although the respondent's recidivism risk was less than 20% when he reoffended at age 59, he nevertheless reoffended. Wood stated, "Thus, one cannot firmly conclude that an age[-]related reduction in risk is appropriate for [the respondent]." Noting that sex-offender treatment "has been found to reduce recidivism," Wood stated that the respondent was not currently in treatment and that his past "progress in treatment was minimal."

In conclusion, Wood stated that although the respondent was 71, his pedophilia and personality disorder were "conditions affecting his emotional and volitional capacity and predisposing him to acts of sexual violence." Wood reiterated that the respondent was assessed as a moderate-high risk to a high risk and that his additional risk factors "increased his risk to engage in acts of sexual violence." Wood also stated, "No reductions in risk were warranted based on medical condition, progress in sex offense specific treatment, or age." Wood opined that the respondent remained "dangerous in that, as a result of his mental disorders, it is still substantially probable that he will engage in acts of sexual violence." Wood further opined that the respondent was still a sexually violent person who continued "to require institutional care in a secure facility."

Dr. Witherspoon's Findings

4

In his report, Dr. Witherspoon indicated that when preparing his evaluation of the respondent, he had also reviewed numerous sources of information, including the respondent's past treatment records. Witherspoon further indicated that he had interviewed the respondent in February 2008. Witherspoon's findings included the following.

The respondent acknowledged that in 1988 he had touched the vaginal area of a four-year-old girl whom he had been babysitting. He claimed that while bathing the girl, she had grabbed his hand and had used it to rub her vaginal area. She told him that it was okay that he touched her and that "it felt good." The girl's mother also suggested that it was okay. The respondent advised that his oldest son and another man had also molested the girl. The respondent indicated that his 1996 sexual-abuse charge was the result of a false accusation made by the mother of a boy who was trying to extort money from him. The respondent "remembered grabbing the boy's leg, but never his penis." The respondent indicated that he pled guilty to the charge because his public defender had refused to take the case to trial. Witherspoon suggested that there was no evidence that the respondent had abused additional victims. Witherspoon stated, "Consistently, [the respondent] denied ever having partaken in sexual contact with any males."

The respondent briefly attended sex-offender treatment following his first incarceration but "did not accept recommended sex offender treatment when incarcerated the second time, as he did not believe that he had justifiably needed it." While committed under the Act, the respondent "entered and dropped out of treatment on two occasions." Witherspoon stated, "Both decisions to stop attending were precipitated by harsh confrontational tactics ***." The respondent complained that his therapists had told him that he had to acknowledge additional sexual-abuse victims. The respondent indicated that he "no longer has sexual thoughts or desires" and that "it is very difficult for him to even obtain an erection." Witherspoon observed that the respondent "did not display marked evidence

5

of deviant sexual attitude or interests" but that "he did offer enough aberrant endorsements to raise cause for concern about attitudes which may permit a rationalization of sexual misconduct with children." Witherspoon further explained, however, that the respondent "did not reflect an ongoing desire to partake in sexual contact with minors."

Witherspoon stated that the respondent's score on the Hare PCL-R, a "tool used to gauge general criminalistic tendencies," was "not associated with marked antisocial tendencies." Additionally, the respondent's profile as determined by the SVR-20, another clinical assessment tool, "suggested a low reoffense risk categorical estimate at this point." Witherspoon criticized the use of actuarial schemes such as the Static-99 and the MnSOST-R, indicating that they were generally unreliable. He also stated, "Most data indicate that persons [the respondent's] age have an estimated reoffense risk of zero percent." Based on his evaluation of the respondent, Witherspoon opined that the respondent's pedophilia was "in remission or resolved" and that he did not otherwise suffer from a recognizable personality disorder. Witherspoon explained that despite the respondent's failure to complete sex-offender treatment, "his estimated sexual reoffense risk categorization at this point is 'low.'" Witherspoon further opined that given the risk level associated with the respondent's age, treatment completion "would appear to be a moot issue at this point."

In conclusion, Witherspoon "recommended that [the respondent] be regarded as falling within the 'low' sexual reoffense risk category at this point as a result primarily of his age, increasing infirmity, and markedly abated if not altogether absent sexually deviant interests and propensities." Witherspoon further recommended that the respondent be discharged from his commitment and "that he not be required to reenroll in sex offender treatment on an outpatient basis."

In its written order denying the respondent's 2007 petition for discharge or conditional release, the circuit court discussed the conflicting opinions of Drs. Wood and Witherspoon.

6

In response to Witherspoon's criticism of the use of the Static-99 and the MnSOST-R as clinical assessment tools, the court stated, "[T]his exact criticism was raised by previous experts who testified on behalf of [the respondent] during an evidentiary hearing in 2004." The court also noted that in *In re Commitment of Simons*, 213 Ill. 2d 523 (2004), the supreme court held that actuarial tools such as the Static-99 and the MnSOST-R were generally accepted in the psychological and psychiatric communities. Observing that the respondent had still not completed any sex-offender treatment, the court stated, "In essence, the only facts that have changed since [the respondent's] last discharge hearing[] are that he is older, more frail, and has received a new independent psychological evaluation." The court then concluded that there was not probable cause to believe that the respondent was no longer a sexually violent person and that there was not cause to believe that it was not substantially probable that he would engage in acts of sexual violence if on release or conditional release. Following the court's denial of his motion to reconsider, the respondent filed a timely notice of appeal.

## DISCUSSION

An individual committed under the Act has the right to petition the committing court for discharge or conditional release. 725 ILCS 207/60(a), 65(b)(1) (West 2006). When that relief is sought, the committing court must set the matter for a probable cause hearing. 725 ILCS 207/60(c), 65(b)(1) (West 2006). "If the court determines at the probable cause hearing *** that probable cause exists to believe that the committed person is no longer a sexually violent person, then the court shall set a hearing on the issue." 725 ILCS 207/65(b)(2) (West 2006). "If the court determines at the probable cause hearing that cause exists to believe that it is not substantially probable that the person will engage in acts of sexual violence if on release or conditional release, the court shall set a hearing on the issue." 725 ILCS 207/60(c) (West 2006). "Whether or not probable cause exists to warrant a further

7

evidentiary hearing is a matter resting in the sound discretion of the court," and "[a]bsent an abuse of that discretion, we will not disturb the court's probable cause determination." *In re Detention of Cain*, 341 Ill. App. 3d at 482.

Arguing that the circuit court erred in denying him an evidentiary hearing on his petition for discharge or conditional release, the respondent contends that in light of Dr. Witherspoon's evaluation, the court improperly found that no probable cause existed to believe that he was no longer a sexually violent person. In essence, the respondent's argument is that the mere existence of conflicting opinions regarding his propensity for sexual violence warrants an evidentiary hearing. We disagree, and we note that we rejected the same suggestion when affirming the circuit court's denial of the respondent's previous petition for a discharge or conditional release.

In *In re Detention of Cain*, No. 5-05-0702 (2006) (unpublished Rule 23 order), the respondent filed a petition for discharge or conditional release in 2005. The respondent's appointed expert, Dr. Robert Chapman, and the State's expert, Dr. Wood, subsequently evaluated the respondent and issued reports with divergent conclusions. Specifically, Chapman concluded that the respondent was no longer a sexually violent person and should be released from his commitment, while Wood concluded that the respondent was still sexually violent and should remain committed. After a probable cause hearing, the circuit court denied the respondent's petition, and he appealed. Affirming the circuit court's judgment, we concluded that the circuit court did not abuse its discretion by giving Wood's evaluation greater weight than Chapman's. *In re Detention of Cain*, No. 5-05-0702 (2006) (unpublished Rule 23 order); see also *In re Ottinger*, 333 Ill. App. 3d 114, 120-22 (2002) (holding that the circuit court did not abuse its discretion by denying the respondent "a full hearing on conditional release or discharge" where conflicting opinions were presented and the court gave greater weight to those of the State's experts).

8

Here, we cannot conclude that the circuit court abused its discretion in determining that other than the respondent's age and the fact that he had since obtained a new favorable evaluation, nothing had changed since the respondent's last request for a discharge or conditional release that would warrant a finding that probable cause existed to believe that he is no longer a sexually violent person. Nor can we conclude that the circuit court abused its discretion in rejecting Witherspoon's suggestion that given the respondent's age, he was a zero risk to reoffend and treatment completion "would appear to be a moot issue." The court obviously gave Wood's opinions regarding the respondent's dangerousness greater weight than Witherspoon's, and Wood explained that the respondent's age as a risk reduction had to be considered in the context of the fact that the respondent reoffended when he was 59. Wood thus concluded that under the circumstances, no reduction in risk based on age was appropriate. We also note that many of Witherspoon's findings, such as his assessment that the respondent's pedophilia was "in remission or resolved," were apparently based solely on what the respondent had told him on the single occasion that they met.

CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Christian County is hereby affirmed.

Affirmed.

GOLDENHERSH, P.J., concurs.

JUSTICE STEWART, dissenting:

I respectfully dissent because I believe the conflicting opinions of qualified experts in this case constituted probable cause for a trial on Cain's petition for discharge or

9

conditional release. The procedure the majority affirms allows the trial court to choose between conflicting expert reports as the primary basis of its decision that one who is imprisoned indefinitely, albeit for treatment, is not entitled to a trial to determine if he must remain imprisoned indefinitely. Instead of allowing a trial at which disputed questions of fact can be resolved, this procedure allows the court to bypass all of the truth-seeking functions and protections of our rules of evidence. The problem with the procedure the majority affirms is that it is devoid of any standard by which it can be determined what must be presented by a detainee to justify a finding of probable cause. If the statutory procedures by which a detainee is allowed to raise the possibility of his discharge or conditional release are to have any meaning, then a detainee should be able to discern what is required in order to obtain a trial at which a trier of fact can consider and resolve disputed issues of fact.

The statutes upon which the trial court based its decision provide for the court to make a determination of whether there is "probable cause" for a trial. In order to obtain a trial on a petition for a discharge without conditions, the court must determine "that probable cause exists to believe that the committed person is no longer a sexually violent person." 725 ILCS 207/65(b)(2) (West 2008). If probable cause is found to exist, a detainee may elect to have a jury determine whether he should be discharged. 725 ILCS 207/65(b)(2) (West 2008). In order for Cain to receive a trial to determine if he qualifies for conditional release, the court must determine that "cause exists to believe that it is not substantially probable that the person will engage in acts of sexual violence if on release or conditional release." 725 ILCS 207/60(c) (West 2008). If this finding is made, a hearing on the petition for conditional release is conducted by the court, without a jury. 725 ILCS 207/60(d) (West 2008). In this case, the trial court based its order denying Cain a trial solely upon its assessment of the experts' reports. Those reports reached opposite conclusions; therefore, faced with conflicting written opinions of experts, the trial court simply chose one expert's opinion over

10

the other.  This procedure denied Cain the opportunity to have the factual issues raised by the conflicting opinions of experts on his petition for discharge decided by a jury.

In its order, the trial court stated that it had discussed with the attorneys the issue of how to avoid an evidentiary hearing when "there are two psychological evaluations which reach opposite conclusions."  The court noted that it had reflected on the matter and had determined as follows:

> "[T]he mere existence of two conflicting reports does not mandate an evidentiary hearing.  The trial court must have the discretion to weigh the credibility of both written reports in deciding the issue of probable cause, before ruling that the Respondent is entitled to an evidentiary hearing ***."

A review of the record shows that numerous questions of fact raised by the pleadings and reports remain unresolved by the trial court.  For example, Cain filed a petition requesting that he be discharged from custody or conditionally released, in part alleging that the State's expert evaluator had failed to follow the mandatory statutory standards.  See 725 ILCS 207/55 (West 2008).  Cain also alleged that, since his initial commitment, the State's evaluators had failed to consider advances in the field of the psychology of sexual offenders, making their opinions less than reliable.  These pleadings raise questions of fact about the reliability of the State's past and present evaluations.

In his report, Cain's evaluator explained what he believed to be problems with the reliability of some of the psychological testing conducted by the State's evaluator.  The trial court dismissed those concerns because the Illinois Supreme Court, in 2004, found that those tests had been generally accepted within the scientific community and that their admission did not require a *Frye* hearing (*Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923)).  *In re Commitment of Simons*, 213 Ill. 2d 523, 535 (2004).  That decision, however, only renders the tests admissible, and the trial court did not comment on Cain's expert's specific concerns

about the reliability of those tests as applied to Cain. Even if the testing relied upon by the State's evaluator is so widely accepted that no *Frye* hearing is required, without the experts' testimony, the trial court had no basis for understanding how and to what extent the test results formed the basis of the expert's opinion.

In addition to the facts recited by the majority, Cain's expert noted that Cain had dropped out of treatment twice due to the "harsh confrontational tactics" of the treatment providers. Cain's evaluator found "no evidence of general significant psychopathy" or any evidence of "deviant sexual attitude or interests." Cain's evaluator acknowledged that Cain had made "aberrant" remarks that concerned him because those attitudes could permit Cain to rationalize sexual misconduct with children, but the evaluator found that Cain "did not reflect an ongoing desire to partake in sexual contact with minors." Contrary to the findings of the State's expert, Cain's expert found that Cain's earlier diagnosis of pedophilia either had been resolved or was in remission. He found that Cain was sexually impotent and had cardiovascular disease, high blood pressure, and back pain. He determined that Cain's "estimated sexual reoffense risk categorization" was "low." He noted that those in Cain's age group, older than 70, had a "reoffense likelihood hovering around zero %" and that, as a result, whether or not Cain completed treatment "would appear to be moot." These findings raise issues of fact concerning what level and type of treatment, if any, Cain requires and whether he continues to be a threat to society.

The pleadings and written reports of the two evaluators raised numerous questions of fact. In order to resolve those questions of fact, the trial court had to make determinations about which expert's opinion was entitled to greater weight. Even though this court has endorsed that very process in Cain's past appeals, I disagree with those decisions. Since Cain's initial commitment in 1999, the trial court has denied Cain's requests to be discharged or conditionally released at least eight times, five times without a trial of any type. This is

12

not the first time that the trial court has denied Cain a trial when an appointed expert reached the conclusion opposite to that of the State's expert. On prior occasions, an expert other than the one appointed to examine Cain in this proceeding has determined that he should be discharged. The State's expert has repeatedly opined that his imprisonment should continue. If the opinion of a qualified expert that Cain should be discharged from confinement is insufficient probable cause to allow a trial where a trier of fact determines the ultimate issue, then what must he do to establish probable cause? Must he have the opinions of two experts to overcome the opinion of the State's expert at the probable cause hearing?

The procedure affirmed by the majority is contrary to the rules of evidence and is not supported by the plain words of the Act. It is contrary to the rules of evidence because it requires a trial judge to do the impossible–make credibility and reliability determinations based upon the content of written reports of experts without any testimony from the authors. It is not supported by the plain words of the Act because the plain meaning of a probable cause hearing is to determine whether reasonable grounds exist to believe that a detainee should be discharged or conditionally released. If such grounds exist, the detainee is entitled to a trial where a trier of fact weighs the credibility of witnesses, not reports, and determines the ultimate issue. Surely, the written opinion of a qualified expert that a detainee should be discharged meets the probable cause standard.

I am convinced that, in this case, the trial court abused its discretion, and its order denying Cain a trial to determine whether he should be discharged or conditionally released should be reversed.

NO. 5-09-0019

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| *In re* DETENTION OF HARRY CAIN | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Christian County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 98-MR-60 |
| | ) | |
| Harry Cain, | ) | Honorable |
| | ) | Michael D. McHaney, |
| Respondent-Appellant). | ) | Judge, presiding. |

---

**Opinion Filed**: June 25, 2010

---

**Justices**: Honorable James M. Wexstten, J.

Honorable Richard P. Goldenhersh, P.J.,
Concurring
Honorable Bruce D. Stewart, J.,
Dissenting

---

**Attorney for Appellant** Thomas E. Doyle, 123 S. Washington, Taylorville, IL 62568-0320

---

**Attorneys for Appellee** Lisa Madigan, Attorney General of Illinois, Michael A. Scodro, Solicitor General, Michael M. Glick, Stephen M. Soltanzadeh, Assistant Attorneys General, 100 West Randolph Street, 12th Floor, Chicago, IL 60601-3218