THIRD DIVISION
JUNE 29, 2007

No. 1-05-2646

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 00 CR 24939 |
| | ) | |
| TERE MAGEE, | ) | The Honorable |
| | ) | Marcus R. Salone, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE GREIMAN delivered the opinion of the court:

Following a jury trial, defendant, Tere Magee, was convicted of two counts of armed robbery and two counts of aggravated criminal sexual assault in conjunction with an incident involving two women at a beauty salon and was later sentenced to a total of 50 years' imprisonment. On appeal, defendant contends that he was denied a fair trial because the trial court impermissibly instructed the jury that the eyewitnesses' level of certainty and the accuracy of their prior descriptions were relevant factors in assessing the reliability of their identifications. In addition, defendant contends that the trial court improperly increased his sentence after its imposition. Finally, defendant contends that his mittimus must be corrected to accurately reflect the offenses for which he was convicted.

The evidence adduced at trial demonstrated that, at approximately 11:30 p.m. on August 4, 2000, the victims, T.J., a hairstylist, and S.D., her customer, were leaving The Hair Exchange beauty salon when an armed man, later identified by both women as defendant, approached and demanded their money. T.J. complied, but defendant instructed the victims, at gunpoint, to

reenter the locked salon. Once inside, defendant sexually assaulted both women. When defendant eventually left, he took T.J.'s car keys and her $300, S.D.'s purse and her $53, and both women's pants and undergarments. The police arrived on the scene soon after and were given defendant's description. Thereafter, the victims separately identified defendant in a photographic array and a lineup.

At trial, T.J. testified that she had locked the front door to the salon and was in the process of locking the external gate leading to the salon's entryway when defendant first approached and pointed his handgun in her face. It was "brightly" lit outside at the time because the streetlights were on and light was reflecting from inside the beauty shop. T.J. was looking directly at defendant's face when he demanded her money. Then, when he forced her and S.D. back inside the shop, defendant told them to lie on the ground. Defendant turned off the "side light" that constantly remained on in the shop; however, T.J. stated that the soda pop machine continued to give off light. Defendant then closed the front window curtains and paced back and forth, approximately 12 to 15 feet away from T.J.. She was able to see defendant's face as he paced. Defendant subsequently told both women to remove their pants and underwear. He sexually assaulted T.J. first as she lay on her back looking at defendant. Defendant then proceeded to where S.D. was lying and also sexually assaulted her. Defendant, however, remained within T.J.'s view. When he finished, defendant demanded car keys. T.J. grabbed the keys closest to her and he left with the money she initially gave him, S.D.'s purse, both women's pants and underwear. After a few seconds, T.J. stood up and locked the front door of the salon. T.J. subsequently called her mother because she lived nearby and then called the police. She

approximated that the entire incident lasted five minutes.

T.J. described defendant to the jury as a black male, approximately 5 feet 9 inches tall, weighing about 165 pounds, with a medium complexion, hazel or green eyes, a big nose and full lips and having worn black pants, a black sweater and a black skullcap during the offense. T.J. further testified that, when the police arrived, she provided them with a similar description of defendant. T.J. recalled that the police then drove S.D. to the hospital, while she and her mother followed in T.J.'s car. A couple of days later, a detective arrived at T.J.'s house and asked her to view photographs of possible suspects. T.J. immediately recognized defendant as her assailant in one of the photographs. Then, on September 19, 2000, T.J. was asked to view a lineup at a police station, during which she instantly identified defendant. She recalled being absolutely certain that defendant was the offender both times that she identified him.

On cross-examination, T.J. recalled that defendant initially ordered her and S.D. to lie facedown on the floor. When they complied, S.D. was close enough to T.J. that the women could touch. T.J. stated that defendant never "got rid of" his handgun throughout the incident, but she was not focusing on it so she could not recall exactly where it was at any given time. T.J. testified that the description she gave to the police was accurate as possible, but could not recall whether she described defendant as having full lips, being 6 feet tall, weighing 145 pounds or his exact eye color. T.J. admitted that she had a hard time approximating weight and height; however, she stated that, during her subsequent identifications, "when [she] saw him, [she] knew it was him." She could not recall speaking to a detective while at the hospital. T.J. also could not recall what the detective said before she viewed the photographic array.

S.D. testified consistent with the sequence of events as described by T.J.. She stated that, while defendant was sexually assaulting T.J., S.D. was not looking at her or defendant. However, when defendant moved over to S.D., he kneeled over her body with his face approximately 15 to 18 inches away from her own. When defendant left the salon, he took the belongings described by T.J., as well $53 that S.D. previously had in her pants. S.D. recalled that she was still frightened and crying when the police arrived at the salon. S.D. stated that she would not have reported that she was sexually assaulted because, at the time, she understood the term to be synonymous with rape and she had not been raped. S.D. additionally testified that she identified defendant in a photographic array held at her house a couple of days after the offense. She also identified defendant in a lineup held at a police station sometime later. S.D. recalled identifying defendant quickly, without hesitation, on both occasions.

On cross-examination, S.D. stated that she spoke to the police at the salon and told them what had occurred; however, she could not recall providing them with a description of defendant. S.D. recalled that, although defendant turned off the light inside the salon, "[y]ou still could see" because there was "some light from the back." S.D. testified that she saw defendant holding his handgun while in the salon, but she could not recall exactly where it was while he was sexually assaulting her. She stated that defendant sexually assaulted her for approximately two or three minutes and that the entire incident lasted about 30 minutes.

Officer Robert Creeth testified that he arrived at the beauty salon shortly after midnight on August 5, 2000, and spoke to both victims separately. The women told Creeth what had occurred and described the offender. S.D., however, denied being sexually assaulted. Initially,

-4-

there were a few discrepancies between the women's descriptions; therefore, Creeth allowed the women to calm down and then requested that they describe defendant as accurately as possible. Creeth was told that the offender was a black male, about 25 years old, approximately 5 feet 9 inches tall, weighing around 155 pounds, with a light complexion, hazel eyes and wearing black pants, a black sweatshirt and a black skullcap. Creeth subsequently released a flash message to other officers with that description. On cross-examination, Creeth admitted that he changed defendant's description in the original general case report after the victims advised him of some inaccuracies.

Detective George Gallagher testified that he interviewed T.J. and S.D. while they were at the hospital. T.J. described the offender as a black male, 25 to 30 years old, 5 feet 10 inches tell, weighing 155 to 170 pounds, with light skin, hazel eyes, a slender face, big nose and full lips. S.D. described him as a black male, approximately 5 feet 8 inches tall, weighing 150 pounds, with light skin and hazel eyes.

Detective Thomas McCadd testified that, on August 7, 2000, he separately administered a photographic array to both T.J. and S.D. at their respective homes. Both victims immediately identified defendant as their assailant.

Detective Michael McDermott testified that, over the course of the month following the incident, he issued a stop order and attempted to locate and arrest defendant. On September 18, 2000, after receiving information from defendant's friend, McDermott, a number of additional detectives and officers from the Bellwood police department set up surveillance in the friend's home. McDermott eventually recognized defendant in the backyard; announced his office; and

instructed defendant not to run away. Notwithstanding, defendant attempted to flee through adjacent backyards, but McDermott caught him within approximately five minutes and arrested him. The following day, McDermott conducted two separate lineups for each victim, during which both women positively identified defendant.

The defense rested without presenting any additional evidence.

The jury ultimately found defendant guilty of two counts of armed robbery and four counts of aggravated criminal sexual assault. The trial court denied defendant's subsequent motion for a new trial.

During defendant's sentencing hearing, the trial court considered arguments in mitigation and aggravation. In aggravation, the State presented certified copies of three prior convictions; testimony from two women whom defendant robbed at gunpoint at beauty salons in July and August 2000; and the instant victims' impact statements. The trial court initially entered convictions for counts I, II, IX, XIX, XXII and XXIII, and sentenced defendant to a total of 42 years' imprisonment: a concurrent 10-year prison term for the armed robbery counts, I and II, to run consecutive to the remaining counts; and four consecutive 8-years prison terms for the aggravated criminal sexual assault counts, IX, XIX, XXII and XXIII.

After admonishing defendant of his appellate rights, defense counsel asked the court whether any of the counts merged. The trial court responded in the affirmative and merged count XIX into count IX with an accompanying consecutive sentence of 16 years' imprisonment and merged count XXIII into count XXII also with an accompanying consecutive 16-year prison term. Defense counsel then advised the trial court regarding defendant's days of credit for time

already served, after which a conversation was held off the record. When it returned on the record, the court modified defendant's armed robbery sentence, such that counts I and II were corrected to reflect a concurrent 18-year prison term, to run consecutive to counts IX and XXII, for a total of 50 years' imprisonment. The trial court denied defendant's subsequent motion to reconsider his sentence, in which he argued, *inter alia*, that his sentence was excessive in light of his background and participation in the offense, and also denied defendant's supplemental motion for a new trial. This timely appeal followed.

As an initial matter, we address the State's motion to strike portions of defendant's brief, which we took under advisement with this case. The State argues that defendant erroneously relies on scientific evidence not presented at trial to support his attack on the reliability of the victims' identification. Defendant concedes that the scientific evidence was not considered at trial; however, he responds that this court may consider the articles discussed pursuant to In re Commitment of Simons, 213 Ill. 2d 523 (2004), where the supreme court determined that a "reviewing court may consider not only the trial court record, but also, where appropriate, sources outside the record, including legal and scientific articles, as well as court opinions from other jurisdictions." In re Commitment of Simons, 213 Ill. 2d at 531. We disagree.

Defendant's broad application of the In re Commitment of Simons language is both misleading and inaccurate. The issue before the supreme court in In re Commitment of Simons was whether a reviewing court should conduct *de novo* review of a lower court's Frye analysis,[1]

_____

[1]The Frye analysis (Frye v. United States, 293 F. 1013 (D.C. Cir. 1923)), or general acceptance test, controls whether scientific evidence is admissible at trial. In re Commitment of

1-05-2646

and, in so doing, rely upon materials outside the trial record. In re Commitment of Simons, 213 Ill. 2d at 530-31. The supreme court concluded that *de novo* review was appropriate in that context because "the trial court is not asked to determine the validity of a particular scientific technique," but instead must determine whether a general consensus existed in the scientific community regarding the reliability of the particular technique at issue. In re Commitment of Simons, 213 Ill. 2d at 532. In that pursuit, relying on materials outside the trial record is not problematic because issues of witness credibility and hearsay do not exist. In re Commitment of Simons, 213 Ill. 2d at 532, citing People v. Miller, 173 Ill. 2d 167, 205 (1996).

The case at bar is completely distinguishable. Primarily, no Frye analysis was conducted at trial. More important still, defendant does not merely rely on the scientific evidence to demonstrate a general acceptance for a particular technique; rather, he submits the articles for their substance and ultimate findings. Therefore, there is an existing concern regarding hearsay, in that the author cannot be observed or cross-examined. Consequently, we grant the State's motion to strike those portions of defendant's appellate brief which discuss psychological studies not presented at trial and that do not appear in the record on appeal. See People v. Edwards, 74 Ill. 2d 1, 7 (1978) ("[w]here the record is insufficient or does not demonstrate the alleged error, the reviewing court must refrain from supposition and decide accordingly").

We now turn to those issues presented on appeal. Defendant first contends that he was denied a fair trial because the jury incorrectly relied upon the level of the witnesses' certainty and the accuracy of their prior descriptions in determining whether their identifications were reliable.

Simons, 213 Ill. 2d at 529.

-8-

1-05-2646

The State responds that defendant has waived this issue for purposes of appeal. In the alternative, the State argues that the victims reliably identified defendant.

To preserve an issue for appellate review, a defendant must object at trial and include the issue in a posttrial motion. People v. Enoch, 122 Ill. 2d 176, 186-87 (1988). Defendant concedes that he failed to preserve this issue; however, he contends that review remains proper pursuant to the plain error doctrine. Despite forfeiture, a reviewing court may consider an error under the plain error rule when the trial evidence was closely balanced or when the error is "so substantial that it affected the fundamental fairness of the proceeding, and remedying the error is necessary to preserve the integrity of the judicial process." People v. Hall, 194 Ill. 2d 305, 335 (2000); see 134 Ill. 2d R. 615(a).

Application of the plain error rule assumes, however, that an error occurred in the trial court. We conclude that the trial court did not err in instructing the jury to consider the level of the witnesses' certainty and the accuracy of their prior descriptions in determining whether their identifications were reliable. We are not persuaded by defendant's argument that these two factors used in assessing witness identifications are grossly misleading where courts have consistently relied upon those and the other factors first announced by the Supreme Court in Neil v. Biggers, 409 U.S. 188, 34 L. Ed. 2d 401, 93 S. Ct. 375 (1972), in making reliability determinations. See People v. Slim, 127 Ill. 2d 302 (1989); People v. Harris, 238 Ill. App. 3d 575, 578 (1992). Moreover, defendant concedes that the jury was properly instructed to consider all of the Neil factors. *Cf.* People v. Gonzalez, 326 Ill. App. 3d 629, 635-38 (2001) (finding plain error where the trial court read an "or" in between each factor, thereby improperly suggesting that

-9-

any one factor made the identification reliable). Consequently, we find no plain error.

Waiver aside, we find that defendant's conviction was sufficiently supported by the victims' positive identifications. Although defendant did not explicitly challenge the sufficiency of the evidence presented at trial, he attacked the reliability of the victims' testimony and therefore we review whether the evidence supported his convictions.

When reviewing the sufficiency of the evidence, it is necessary to determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) Jackson v. Virginia, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789 (1979). It is not the function of the reviewing court to retry the defendant or substitute its judgment for that of the trier of fact. People v. Evans, 209 Ill. 2d 194, 209 (2004). Rather, the trier of fact assesses the credibility of the witnesses, determines the appropriate weight of the testimony and resolves conflicts or inconsistencies in the evidence. Evans, 209 Ill. 2d at 211. In order to overturn the trial court's judgment, the evidence must be "so unsatisfactory, improbable or implausible" to raise a reasonable doubt as to the defendant's guilt. People v. Slim, 127 Ill. 2d 302, 307 (1989).

The lack of physical evidence in this case does not render the jury's finding unsatisfactory, improbable or implausible, where two eyewitnesses positively identified defendant as the perpetrator of the crimes. Identification by a single witness is sufficient to support a conviction if the defendant is viewed under circumstances permitting a positive identification. Slim, 217 Ill. 2d at 307. An identification, however, will not be deemed sufficient if it is vague or doubtful. Slim,

-10-

217 Ill. 2d at 307. In Neil, the Supreme Court announced factors to be considered when evaluating the reliability of identification testimony: (1) the witness's opportunity to view the defendant during the offense; (2) the witness's degree of attention at the time of offense; (3) the accuracy of the witness's prior description of the defendant; (4) the witness's level of certainty at the subsequent identification; and (5) the length of time between the crime and the identification. Neil, 409 U.S. at 199-200, 34 L. Ed. 2d at 411, 93 S. Ct. at 382; see Slim, 127 Ill. 2d at 307-08.

In the instant case, review of the record demonstrates that both eyewitnesses provided reliable identifications of defendant. T.J. and S.D. had ample time to view defendant while being robbed and sexually assaulted at gunpoint. T.J. testified that she was face to face with defendant when he first approached her outside under the streetlights. In addition, both women stated that, although defendant had turned off a light inside the beauty salon, there was enough light to view defendant's face while he was inches from them during their respective sexual assaults. T.J. and S.D. were extremely attentive during the offenses, focusing on defendant's features and the fact that his handgun remained ever present. The degree of attention led the victims to provide detailed descriptions of defendant, such as approximations of his height and weight, the color of his eyes and complexion, facial features and what he was wearing. Although these descriptions varied slightly, the supreme court has determined that "[t]he presence of discrepancies or omissions in a witness' description of the accused do not in and of themselves generate a reasonable doubt as long as a positive identification has been made." Slim, 127 Ill. 2d at 309. Moreover, both T.J. and S.D. positively identified defendant in separately administered photographic arrays within days of the offense and again identified him in distinct lineups

performed approximately six weeks later. Each identification was individually made without hesitation. Accordingly, we conclude that the evidence sufficiently supported the jury's finding.

Defendant next contends that the trial court violated the sentencing statute by improperly increasing his sentence after it was already imposed. The State responds that defendant has waived review of this issue. In the alternative, the State argues that the trial court properly modified defendant's sentence during the sentencing hearing, "almost immediately" after the initial pronouncement.

Defendant concedes that he failed to properly preserve this issue by not raising it in the trial court. See People v. Reed, 177 Ill. 2d 389, 393-94 (1997), citing Enoch, 122 Ill. 2d at 186-87. However, relying on People v. Arna, 168 Ill. 2d 107, 113 (1995), defendant argues that his sentence is void and therefore can be challenged at any time. We find that defendant's reliance on Arna is misplaced because a sentence is deemed void when the defendant receives a lesser sentence than required by statute (see People v. Young, 334 Ill. App. 3d 785, 789 (2002), citing People v. Wade, 116 Ill. 2d 1, 6 (1987)), and there is no such argument advanced in the instant case. Notwithstanding, we choose to address the merits of defendant's claim. See People v. Thomas, 354 Ill. App. 3d 868, 883 (2004) (waiver is a limitation on the parties and not on the court).

At issue is whether the trial court improperly increased defendant's sentence "once it [was] imposed." See 730 ILCS 5/5-8-1(c) (West 2000). Section 5-8-1(c) of the Unified Code of Corrections (Code) (730 ILCS 5/5-8-1(c) (West 2000)) provides:

"A motion to reduce a sentence may be made, or the court may reduce a sentence

without motion, within 30 days after the sentence is imposed. A defendant's challenge to the correctness of a sentence or to any aspect of the sentencing hearing shall be made by a written motion filed within 30 days following the imposition of sentence. However, the court may not increase a sentence once it is imposed."

The legislature did not define "impose" within the statute; however, it is well settled that, when interpreting a statute, we must ascertain and give effect to the intent of the legislature by giving terms their plain meaning. People v. Kilpatrick, 167 Ill. 2d 439, 443 (1995). Moreover, our interpretation must consider "the reasons for the provision, the harms to be remedied, and the goals to be achieved." Kilpatrick, 167 Ill. 2d at 443. The supreme court has concluded that the reasoning applied in North Carolina v. Pearce, 395 U.S. 711, 23 L. Ed. 2d 656, 89 S. Ct. 2072 (1969), equally applies to the language of section 5-8-1(c). Kilpatrick, 167 Ill. 2d at 443-44; see People v. Baze, 43 Ill. 2d 298 (1969); see also People v. Rivera, 166 Ill. 2d 279 (1995). In Pearce, the Supreme Court concluded that imposing a more severe sentence following retrial violates a defendant's due process rights because it essentially penalizes the defendant for exercising his right to challenge his conviction and sentence. Pearce, 395 U.S. at 725, 23 L. Ed. 2d at 669, 89 S. Ct. at 2080. Accordingly, the purpose of the Pearce rule is to prevent a court from vindictively resentencing a defendant, deterring him from exercising his rights. Pearce, 395 U.S. at 725, 23 L. Ed. 2d at 669, 89 S. Ct. at 2080.

Our research has not revealed any cases directly on point in this jurisdiction. In People ex rel. Carey v. Rosin, 75 Ill. 2d 151 (1979), the circuit court had modified a sentence more than 30 days after the sentence was originally pronounced and entered into the record, and the supreme

court considered whether a stay of a sentence's execution tolled the period of its modification pursuant to section 5-8-1(c). Rosin, 75 Ill. 2d at 155-56. After reviewing the Code, the supreme court determined that the imposition of a sentence was never synonymously referred to as the execution of a sentence, as argued by the defendant; therefore, the court held that the imposition date, for purposes of the statute, was the date the defendant was sentenced. Rosin, 75 Ill. 2d at 157. Most recently, in People v. Rodriguez, 364 Ill. App. 3d 304 (2006), the Second District referenced the lack of defined timing for the term "impose" in a footnote:

"Section 5-8-1(c) does not supply a definition of 'impose,' which raises interesting questions. For instance, if a trial court orally pronounces a sentence of 10 months but, in the same breath, corrects itself and articulates a sentence of 10 years, has the trial court increased an already imposed sentence?" Rodriguez, 354 Ill. App. 3d at 319 n.3.

The Rodriguez court, however, did not address the question because its was unnecessary for the disposition of that appeal. Rodriguez, 354 Ill. App. 3d at 319 n.3.

Considering the plain meaning of the statute, its purpose as described in Pearce, and the facts of the case at bar, we find that the trial court did not impermissibly increase defendant's sentence after its imposition. Review of the record demonstrates that the trial court initially modified defendant's aggravated criminal sexual assault sentences immediately after admonishing him of his appellate rights, following defense counsel's inquiry whether any of the four counts merged. The court agreed, merged two of the counts and modified the sentence accordingly. The trial court was subsequently apprised of defendant's presentence detention credit and then stated that the matter was concluded; however, prior to dismissing defendant, a conversation took

place off the record. Upon returning on the record, the court amended defendant's armed robbery sentence and then remanded him into custody. We do not find that defendant's sentence was "imposed" until the sentencing proceedings completely concluded and defendant was dismissed from the courtroom. Our interpretation of "impose" and application to the instant facts do not compromise the protection offered by the statute as described by the Pearce rule. Moreover, any other interpretation of the case at bar would be unreasonable and a waste of judicial resources, where the court modified defendant's sentence during the continuous sentencing hearing within, at most, minutes of its initial pronouncement.

We find those cases cited by defendant, Kilpatrick and People v. Jones, 168 Ill. 2d 367 (1995), distinguishable from the case at bar. In Kilpatrick, the supreme court determined that the trial court violated section 5-8-1(c) of the Code when it vacated the defendant's consecutive sentences of 9 and 6 years' imprisonment on a motion to reconsider and imposed a single term of 15 years' imprisonment because, although the overall number of years remained the same, the court impermissibly increased one of the counts after its initial imposition. Kilpatrick, 167 Ill. 2d at 446-47. Similarly, in Jones, the supreme court held that the trial court violated section 5-8-1(c) of the Code when, upon reconsideration, the trial court vacated an improper consecutive sentence and imposed a longer sentence on a single count. Jones, 168 Ill. 2d at 372-73. In both cases, the trial court increased the defendants' sentences upon reconsideration, unlike in the case at bar where the trial court modified defendant's sentence within his sentencing hearing. Our case is more similar to People v. Graham, 229 Ill. App. 3d 733 (1992), where the Fourth District determined that section 5-8-1(c) of the Code was not violated by the lower court's alteration of

the defendant's sentence prior to the conclusion of the sentencing hearing after he demonstrated an unwillingness to comply with the terms of the court's original probation sentence. Graham, 229 Ill. App. 3d at 736. Accordingly, we find that the trial court did not violate section 5-8-1(c) of the Code.

Defendant finally contends, and the State concedes, that his mittimus must be corrected to accurately reflect the offenses for which he was convicted. Defendant's mittimus reflects that he was convicted of three counts of aggravated sexual assault, on counts VI, IX and XXI. However, defendant was merely convicted of counts IX and XXII, where count XIX merged into count IX and count XXIII merged into count XXII. Where the report of the proceedings and the common law record conflict, the court's oral order controls. See People v. Peeples, 155 Ill. 2d 422, 496 (1993). Remand is unnecessary to correct defendant's mittimus because, under Supreme Court Rule 615(b)(1) (134 Ill. 2d R. 615(b)(1)), this court has authority to order the clerk to make the necessary correction. People v. McCray, 273 Ill. App. 3d 396, 403 (1995). We, therefore, instruct the circuit clerk to correct the mittimus to reflect convictions for counts IX and XXII, one to each victim, under section 12-14(a)(4) of the Criminal Code of 1961 (720 ILCS 5/12-14(a)(4) (West 2000)).

Accordingly, we affirm defendant's convictions and sentence. We further instruct the clerk of the circuit court to correct defendant's mittimus as instructed.

Affirmed; mittimus corrected.

THEIS, P.J., and KARNEZIS, J. concur.