2020 IL App (1st) 182242-U

No. 1-18-2242

Order filed September 30, 2020

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 CR 16080 |
| | ) | |
| JUSTIN BARBER, | ) | Honorable |
| | ) | William T. O'Brien, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE REYES delivered the judgment of the court.
Presiding Justice Gordon and Justice Hall concurred in the judgment.

**ORDER**

¶ 1    *Held*:    Defendant's convictions for attempted first degree murder and home invasion are affirmed over his challenge to the sufficiency of the evidence.

¶ 2    Following a bench trial, defendant Justin Barber was found guilty of one count of attempted first degree murder and three counts of home invasion, and was sentenced to concurrent terms of 25 years' imprisonment. On appeal, defendant argues the evidence is insufficient to prove him guilty beyond a reasonable doubt of the offenses. We affirm.

¶ 3    Defendant was charged with one count of attempted first degree murder and three counts of home invasion arising out of an altercation at a house party.[1] The attempted first degree murder count alleged defendant, without lawful justification and with intent to kill, pointed a gun at Samuel Garland and pulled the trigger, which constituted a substantial step toward the commission of first degree murder. 720 ILCS 5/8-4(a) (West 2016); 720 ILCS 5/9-1(a)(1) (West 2016). The three counts of home invasion alleged defendant, not being a peace officer acting in the line of duty, entered the dwelling place of Matthew, Maxwell, and Benjamin Garland, knowing one or more persons were present, while armed with a gun, and used force or threatened the imminent use of force upon Samuel Garland.[2] 720 ILCS 5/19-6(a)(3) (West 2016).

¶ 4    Matthew Garland testified he lived in a house on West Hobart Avenue with his brothers, Benjamin and Maxwell. On October 1, 2016, Matthew's brothers hosted a party at the house. Matthew went to bed around midnight because he had to work in the morning. At approximately 2:30 a.m., Matthew was woken up, went downstairs, and saw people fighting near the front door. He looked out a window to the right of the front door and saw defendant, whom he identified in court, throw a jug, which smashed a pane of the window.

¶ 5    Matthew then saw defendant go to the front yard, where approximately 15 people were fighting. People ran into the house saying someone had a gun. Defendant entered the house wearing a black hoodie and a white T-shirt, holding a two-tone, nickel-plated, 9-millimeter semiautomatic gun. The top of the gun was silver. Matthew went upstairs, called 911, and went back downstairs to the kitchen.

---

[1] Defendant was also charged with three counts of residential burglary, which the State subsequently nol-prossed.

[2] As the Garlands share the same last name, we will refer to them by their first names hereafter.

¶ 6 Defendant entered the kitchen and circled behind Matthew's brother Samuel, who was near the refrigerator. Samuel's back was to defendant. Matthew saw defendant rack the slide of the gun, which caused a bullet to move from the magazine to the chamber so the gun could fire. He saw defendant raise the gun with both hands and point it at the back of Samuel's head, with the barrel approximately three feet from Samuel's head. Matthew saw defendant pull the trigger with his index finger and heard a click. The bullet "stovepiped," meaning it protruded sideways out of the gun's ejection port. This prevented the firing pin from making contact with the bullet, so the gun did not fire. Defendant handed the gun to an Asian man, who racked the slide several times, and the "stovepiped" bullet fell to the ground. A third man retrieved the bullet, and he and the Asian man ran out of the house with the bullet and the gun. Defendant exited through the front door.

¶ 7 On cross-examination, Matthew testified he was not drinking during the party. He spoke to police immediately after the incident and the following day at the police station. He told police about the Asian man clearing the "stovepiped" bullet and the third individual retrieving the bullet from the ground.

¶ 8 Dominick Fini testified he attended the party at the Garland house because his friend Matthew invited him. Fini first saw defendant, whom he did not know, in the living room, wearing a white T-shirt and jeans.

¶ 9 Around 2:00 or 2:30 a.m., Samuel and Fini asked people to leave the party. Benjamin yelled at everyone to get out, and a crowd of people began pushing and shoving. The crowd moved from the living room toward the front door. Fini went to the front porch and saw people fighting in the front yards of the Garland house and the neighbor's house. A white Range Rover pulled up in front of the Garland house. Fini saw defendant go to the driver's side of the vehicle and return wearing

a black hoodie and holding a gun. Defendant pointed the gun and everybody in front of the house ran. Fini went inside and, near the kitchen, he saw defendant, whom he identified in court, point the gun at him from four to five feet away. Defendant did not say anything to Fini and continued moving through the house.

¶ 10 Fini went into the kitchen because he saw Benjamin and Maxwell there. Samuel came into the kitchen, and Fini saw defendant approach Samuel from behind with the gun raised. The gun was a semiautomatic with a black handle and a silver top. Fini saw defendant hold the gun by his right hip and "rack" the slide by pulling it back with his left hand, which put a round in the chamber. Nothing obstructed Fini's view of the gun, and the kitchen lights were on. Fini had not been drinking that evening.

¶ 11 After defendant chambered the round, Fini saw him lift the gun to eye level with both hands and point it at the back of Samuel's head. The barrel was approximately two feet from the back of Samuel's head. Fini saw defendant pull the trigger and heard the gun click.

¶ 12 The bullet "stovepiped," meaning it jammed in the slide and the gun could not fire. The bottom of the bullet was facing toward Fini, and he could see it was a 9-millimeter bullet. Defendant handed the gun to a man "of Asian descent" behind him. This man racked the slide, removed the jammed bullet, and handed the gun to another individual. These two individuals then left the house with the gun and the bullet. Defendant exited through the front door.

¶ 13 On cross-examination, Fini testified he was behind a pillar on the front porch when he saw defendant point the gun at the crowd of people in the front yard. He next saw defendant enter the kitchen from the direction of the front door, then reenter the kitchen from the back of the house, behind Samuel.

¶ 14    Fini spoke to a police officer at the station the following day, and told that officer he saw the bullet stovepipe. He also told the officer he saw defendant hand the gun to a person who appeared to be of Asian descent, who cleared the bullet, took it, and handed the gun to a third person.

¶ 15    Benjamin Garland testified he lived with his parents and his brothers, Maxwell and Matthew. On the night of October 1, 2016, Benjamin and his brothers hosted a party. Benjamin drank two or three beers at the party. Around midnight, people who had not been invited to the party arrived, including defendant, whom Benjamin identified in court. Benjamin did not know defendant and had never seen him before.

¶ 16    At approximately 2:30 a.m., Samuel decided to end the party, but no one left. Benjamin screamed at everyone to get out. Defendant got into an argument with a "big Polish dude," and Benjamin separated the two men. As defendant was leaving, the "big Polish dude" called defendant a "n***." Defendant turned around, went up to the "big Polish dude," and said, "I'm going to bring a gun. I'm going to kill you all. I'm going to put you all in body bags. You-all f***ed up." Defendant then exited through the front door.

¶ 17    Benjamin went to the kitchen and told Samuel, Matthew, Maxwell, and Fini that someone was going to come into the house with a gun. Benjamin was in the middle of the kitchen, and Samuel was near the microwave, facing toward the back of the house. Benjamin saw defendant enter through the front door, holding a gun at his right side. The gun had a black handle and a silver top. Defendant raised the gun with both hands at the level of his chin and pointed it at the back of Samuel's head from five to six feet away.

¶ 18   Benjamin saw defendant "fuss with his hands and like squeeze them;" he saw defendant's "fingers moving," although he did not know where on the gun defendant's fingers were positioned. Benjamin saw the slide of the gun go back, and a bullet jammed in the slide, sticking out of the gun. Defendant handed the gun to someone to his right, whom Benjamin could not describe. That person handed the gun to a third person, and the two of them left. Defendant exited through the front door.

¶ 19   On cross-examination, Benjamin testified he did not hear defendant pull the trigger or any other sounds because he was "too in the moment." When Benjamin spoke to police after the incident, he told them he had separated defendant from another man because they were about to fight. He also told police he saw a bullet jammed in the gun. He did not remember whether he told police defendant handed the gun to a second man or that that man handed the gun to a third person.

¶ 20   Samuel Garland testified he lived approximately one mile from his parents' house on West Hobart Avenue, which was where his brothers Matthew, Benjamin, and Maxwell lived. On October 1, 2016, the Garland brothers hosted a party. Samuel's friends began arriving around 10:00 p.m. and he drank a couple beers. Shortly after midnight, people Samuel did not know began arriving. Defendant, whom Samuel identified in court, was among the group of people Samuel did not know and who had not been invited to the party. Defendant was in the living room when Samuel first saw him, wearing a white T-shirt and blue jeans.

¶ 21   At approximately 2:00 or 2:30 a.m., Samuel asked people to leave the party. Defendant and his friends did not leave the party, and an argument started. Benjamin screamed at everyone to get out, and the argument moved toward the front door. Someone threw a bottle of alcohol from the front door into the living room, which struck Samuel in the head near his right eyebrow.

¶ 22     Samuel went to the kitchen, called 911, and reported a fight had broken out and he had been hit with a bottle. Samuel heard people talking about a gun, so he went to the front porch. A "good amount" of people were in the front yard. A white Range Rover pulled up in front of the house, and Samuel saw defendant run to it. Defendant came around the rear end of the Range Rover, approaching the house, wearing a black hoodie. Samuel saw a gun in defendant's right hand.

¶ 23     Samuel ran through the house to a gangway on the west side of the house. He heard defendant say, "[G]ot you now," and saw him raise the gun toward him and another man in the gangway from 20 to 25 feet away. Samuel ran to the backyard, then into the kitchen through the back door. Defendant entered the kitchen with the gun in his right hand. The gun was a semiautomatic with a black handle and a silver top.

¶ 24     Defendant passed Samuel in the kitchen and walked toward the back of the house. Samuel and Benjamin were in the kitchen near the refrigerator, and Maxwell and Fini were in the kitchen as well. Benjamin said somebody had a gun, and Samuel told him to be quiet. Samuel turned around and saw defendant, who was in the kitchen, hand the gun to another man, whom Samuel did not know and could not identify. That man handed the gun to a third individual, who took the gun and ran out of the house. Defendant exited through the front door.

¶ 25     The State showed Samuel video recordings from a neighbor's home surveillance system. He identified a white SUV in front of the house. Samuel identified defendant near the curb in front of the house, wearing a black hoodie and a white shirt, and holding a gun. Samuel also identified defendant in two still photographs created from the surveillance video recordings. One photograph

showed defendant in the easement in front of the house after he returned from the white SUV, and the second photograph showed defendant closer to the sidewalk in front of the house.

¶ 26    On cross-examination, Samuel testified he drank beer at the party, and that one of his brothers was drinking as well. When Samuel first saw defendant with a gun, he was approximately 40 feet from defendant, it was dark outside, and there was a "wild scene" with people fighting in the front yard. The surveillance video recordings did not show defendant pointing the gun toward the gangway. Defendant did not pull the trigger when he pointed the gun at Samuel while he was in the gangway.

¶ 27    Samuel went from the gangway to the kitchen, where he saw defendant walk past him with the gun in his hand. Samuel and defendant were approximately five feet away from each other. They looked at each other, but did not say anything, and defendant continued through the kitchen. For approximately five seconds, defendant was behind Samuel, so Samuel could not see him. He did not see defendant go through the back door into the backyard. Samuel did not hear anything that sounded like a clicking noise.

¶ 28    Officer Anthony Janotta testified he was working with his partner on the evening of October 2, 2016. Janotta was in uniform and driving a marked police vehicle. Janotta and his partner arrested defendant at his house. One of defendant's relatives signed a form consenting to a search of the house, but nothing was recovered during that search.

¶ 29    On cross-examination, Janotta testified he searched defendant when he was arrested, but did not recover any weapons or ammunition.

¶ 30    Detective Tom Schipplick testified that, on October 3, 2016, he was assigned to investigate the incident that occurred at the Garland house the previous day. He spoke to Samuel by phone and met him and his brothers at the Garland house.

¶ 31    On the afternoon of October 3, 2016, Samuel, Matthew, and Fini met Schipplick at the Area North police station. Schipplick interviewed them individually for approximately 10 minutes each and took notes, but did not record their statements verbatim. That evening, Schipplick met Benjamin, Maxwell, and two other witnesses at Area North. Schipplick also interviewed these witnesses individually for approximately 10 minutes each and took notes, but did not record their statements verbatim either.

¶ 32    On cross-examination, Schipplick testified Matthew stated defendant handed the gun to a second person, but did not mention that person's race. Matthew did not state the second person racked the slide, a bullet fell out of the gun, or a third person retrieved the bullet from the ground. Fini stated defendant handed the gun to a man standing behind him, but did not mention that man's race. Fini did not state this man cleared the gun, took the jammed bullet, and handed the gun to a third person. Benjamin did not state a "Polish guy" called defendant a racial slur, and Schipplick could not recall whether Benjamin stated he broke up a fight.

¶ 33    Detective Eric Oswald testified he was working with a partner on October 3, 2016. They were assigned to obtain surveillance video recordings from a house on West Hobart Avenue next to the Garland house relating to an incident that occurred the night before. Oswald and his partner went to the neighbor's house, which had surveillance cameras affixed to its outside, and met with the homeowner. The parties stipulated these surveillance cameras were in good working condition

and activated between approximately 2:45 a.m. and 3:30 a.m. on October 2, 2016, and that the cameras recorded true and accurate depictions of events at the Garland house during that time.

¶ 34    The video recordings from the neighbor's surveillance cameras show a white SUV stopping in front of a single family residence. Approximately ten to fifteen people are in the yard, sidewalk, and street in front of the house. A man wearing dark pants and a dark jacket over a white shirt runs from the rear of the SUV across the street, toward the people in front of the house. As he approaches the curb, he raises both hands and appears to point an object at two people on the sidewalk. The man lowers his hands and runs toward the front porch of the house, where he disappears from the cameras' field of view.

¶ 35    The State moved the following exhibits into evidence: a DVD containing the video recordings from the neighbor's surveillance cameras, still photographs from the surveillance video recordings; photo array advisory forms signed by Samuel, Benjamin, Matthew, and Fini; photo arrays in which Samuel, Benjamin, Matthew, and Fini identified defendant; a photograph in which Fini identified defendant; photographs of the Garland house and the broken front window; and the consent to search form signed by defendant's relative when defendant was arrested.

¶ 36    Defendant made a motion for a directed finding, which was denied.

¶ 37    In closing argument, defendant attacked the credibility of Matthew, Benjamin, Samuel, and Fini, focusing on discrepancies between their trial testimony and their statements to police after the incident. Defendant also argued there was no evidence the gun was operable, and noted that the State did not introduce the gun or the bullet into evidence.

¶ 38    The court found defendant guilty on all counts. In announcing its ruling, the court found the "civilian witnesses" to be "very credible," stating "the version that they gave was consistent

with each other, as well as consistent with the video that [the court] had seen and viewed as one of the exhibits." The court rejected defendant's argument the civilian witnesses were not credible because they had been impeached, explaining "[t]he impeachment focuses on events that occurred after the crime, basically, after the trigger is pulled and the gun jams. The impeachment is minor because it doesn't really change all the events leading up to it, none of that is impeached."

¶ 39 Defendant filed a motion for a new trial, arguing "numerous conflicts" in the witnesses' testimony created a reasonable doubt as to his guilt. The court denied this motion.

¶ 40 The court sentenced defendant to concurrent terms of 25 years' imprisonment on the one count of attempted first degree murder and three counts of home invasion. Defendant made an oral motion to reconsider sentence, which was denied.

¶ 41 Defendant timely appealed.

¶ 42 On appeal, defendant challenges his convictions for attempted first degree murder and home invasion based on the sufficiency of the evidence, arguing the State did not prove him guilty beyond a reasonable doubt.

¶ 43 On a challenge to the sufficiency of the evidence, the relevant inquiry is whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the elements of the charged crimes beyond a reasonable doubt. *People v. Pizarro*, 2020 IL App (1st) 170651, ¶ 29. Upon review, we may not substitute our judgment for that of the trier of fact with respect to the weight of the evidence or the credibility of witnesses. *People v. Jackson*, 232 Ill. 2d 246, 280-81 (2009). " 'The mere existence of conflicting evidence at trial does not require a reviewing court to reverse a conviction.' " *People v. Peoples*, 2015 IL App (1st) 121717, ¶ 67 (quoting *People v. Goodar*, 243 Ill. App. 3d 353, 357 (1993)). " 'It is sufficient if all of the evidence

taken together satisfies the trier of fact beyond a reasonable doubt of the defendant's guilt.' " *Id.* (quoting *People v. McCarter*, 2011 IL App (1st) 092864, ¶ 22). We will not reverse a conviction unless the evidence is so improbable, unreasonable, or unsatisfactory as to justify a reasonable doubt of defendant's guilt. *People v. Rowell*, 229 Ill. 2d 82, 98 (2008).

¶ 44    To sustain the charge of attempted first degree murder (720 ILCS 5/8-4(a) (West 2016); 720 ILCS 5/9-1(a)(1) (West 2016)), the State had to prove beyond a reasonable doubt that "(1) defendant performed an act constituting a substantial step toward the commission of murder, and (2) defendant possessed the criminal intent to kill the victim." *People v. Viramontes*, 2017 IL App (1st) 142085, ¶ 52. The State alleged defendant, without lawful justification and with intent to kill, committed that substantial step when he pointed a gun at Samuel and pulled the trigger.

¶ 45    Defendant primarily argues the State failed to prove he took a substantial step toward committing first degree murder as the witness testimony was insufficient to prove he pulled the trigger while pointing the gun at Samuel's head. Specifically, defendant contends Samuel and Benjamin did not see him pull the trigger; Matthew and Fini, who testified they saw him pull the trigger, were not credible as they were impeached by their statements to police; and the State called no expert witnesses qualified to testify about the gun malfunctioning.

¶ 46    What constitutes a substantial step depends on the facts and circumstances of each case. *People v. Perkins*, 408 Ill. App. 3d 752, 758 (2011). Although a defendant need not have committed the " 'last proximate act' " to actual commission of the crime, mere preparation is not enough. *Id.* (quoting *People v. Terrell*, 99 Ill. 2d 427, 433 (1984)). A substantial step puts a defendant in " 'dangerous proximity to success.' " *Id.* (quoting *People v. Hawkins*, 311 Ill. App. 3d 418, 423-24 (2000)).

¶ 47    Here, taking the evidence in the light most favorable to the State, as we must, we conclude a rational trier of fact could have found the State proved defendant took a substantial step toward the commission of first degree murder. The evidence, including video evidence, established defendant entered the Garland house armed with a 9-millimeter semiautomatic gun. In the kitchen, Matthew and Fini saw him rack the slide and chamber a bullet, preparing the gun to fire. Matthew, Fini, and Benjamin all saw defendant point the gun at the back of Samuel's head, with the barrel just a few feet from Samuel's head. Matthew and Fini, who were a few feet away from defendant in a lighted kitchen, with unobstructed views of the gun, saw him pull the trigger. Matthew and Fini heard the gun click, supporting the inference defendant pulled the trigger, but the gun malfunctioned. Indeed, the witnesses saw the bullet had "stovepiped," sticking sideways out of the gun and preventing the gun from firing. From this evidence, a rational trier of fact could conclude defendant took a substantial step toward the commission of first degree murder.

¶ 48    In fact, the evidence supported an inference that, had the gun fired, Samuel almost certainly would have been killed, and defendant would have committed first degree murder itself. Thus, the State established defendant committed the "last proximate act" to first degree murder, more than enough to carry its burden as to this element. (Internal quotations omitted.) See *Perkins*, 408 Ill. App. 3d at 758. We agree with the trial court: "[defendant] did everything he possibly could to kill [Samuel] Garland. The only thing that stood in his way was the malfunction of a gun, but he did all he could possibly do to do it." The evidence sufficiently established defendant took a substantial step toward commission of first degree murder. Thus, we affirm his conviction for attempted first degree murder.

¶ 49 Nevertheless, defendant argues Matthew and Fini were not credible because they did not tell Schipplick about the Asian man clearing the jammed bullet or the third individual retrieving the bullet from the floor. However, the trial court found Matthew and Fini to be "very credible" and rejected this exact argument. We do not substitute our judgment for that of the trial court with respect to credibility. *Jackson*, 232 Ill. 2d at 280-81. Therefore, we reject defendant's invitation to reassess Matthew and Fini's credibility, and we defer to the trial court's determinations.

¶ 50 Moreover, we agree with the trial court that Matthew and Fini's impeachment by omission only pertained to events that occurred after defendant had already committed home invasion and attempted murder. The impeachment did not negate the witnesses' affirmative, uncontradicted testimony they saw defendant pull the trigger. "The trier of fact is free to accept or reject as much or as little of a witness's testimony as it pleases" (*McCarter*, 2011 IL App (1st) 092864, ¶ 22), and here, the trial court could have accepted Matthew and Fini's testimony about defendant pulling the trigger even if it had doubts about their testimony regarding what happened thereafter. Thus, Matthew and Fini's impeachment by omission does not create a reasonable doubt defendant pulled the trigger of the loaded gun while pointing it at Samuel's head at close range.

¶ 51 Similarly, the fact that Samuel and Benjamin did not see defendant pull the trigger does not undermine the evidence of this element, as defendant contends. Samuel's back was to defendant when he pulled the trigger. Thus, it is not surprising Samuel did not see defendant pull the trigger, and the fact he did not see defendant pull the trigger does not mean it did not happen. Benjamin did not see defendant pulled the trigger specifically, but he did see defendant "squeeze" his hands while pointing the gun at Samuel's head. A reasonable trier of fact could interpret Benjamin's testimony as essentially describing defendant pulling the trigger, even though he did

not see that exact act or use that exact term. To the extent Benjamin was impeached by omission because he did not tell Schipplick about two other individuals clearing the jammed bullet and leaving the house with the bullet and the gun, that impeachment did not negate his testimony in its entirety for the reasons explained above.

¶ 52    Defendant argues none of the State's witnesses were experts qualified to testify about the gun malfunction. There is no dispute *that* the gun did not fire, and the State did not have to prove *why* it did not fire, because that is not an element of attempted first degree murder. See *Viramontes*, 2017 IL App (1st) 142085, ¶ 52. The absence of expert testimony on this point is immaterial to defendant's conviction.

¶ 53    Defendant also claims "it is common knowledge that with a stovepipe malfunction 'you don't get a click,' " and cites a YouTube video in support of that contention. However, defendant did not introduce any such evidence at trial, and this YouTube video is not part of the record on appeal, so we will not consider it. See *People v. Magee*, 374 Ill. App. 3d 1024, 1030 (2007) (striking portions of the defendant's brief that discussed psychological studies because they were not presented at trial and were not part of the record on appeal); *People v. Mehlberg*, 249 Ill. App. 3d 499, 532 (1993) (reviewing court will not take judicial notice of evidentiary material not presented in the court below). Thus, the evidence was sufficient to establish defendant took a substantial step toward the commission of first degree murder, and we affirm his conviction for attempted first degree murder.

¶ 54    Defendant next argues his conviction for attempted first degree murder should be reversed because the "big Polish dude" called him a "n***" shortly before he retrieved the gun from the Range Rover. We interpret this argument as a challenge to the sufficiency of the evidence

defendant had intent to kill, because defendant cites *People v. Henry*, 3 Ill. App. 3d 235 (1971), in which we reversed a conviction for attempted murder because the surrounding circumstances of a riot failed to establish the defendant's intent to kill.

¶ 55 Attempted murder is a specific intent offense, so the State had to prove defendant had specific intent to kill. *Viramontes*, 2017 IL App (1st) 142085, ¶ 52. "Intent is a state of mind which can be established by proof of surrounding circumstances, including the character of the assault, the use of a deadly weapon, and other matters from which an intent to kill may be inferred." *People v. Brown*, 2015 IL App (1st) 131873, ¶ 14.

¶ 56 A rational trier of fact could find the State proved defendant intended to kill. As defendant was leaving the party, he said, "I'm going to bring a gun. I'm going to kill you all. I'm going to put you all in body bags. You-all f***ed up." After he retrieved the gun from the Range Rover, he pointed it at Samuel in the gangway and said, "[G]ot you now." A defendant's threats are evidence of his intent to kill. See *People v. Hill*, 276 Ill. App. 3d 683, 688 (1995). Moreover, the circumstantial evidence, such as "the character of the assault" and defendant's "use of a deadly weapon" (*Brown*, 2015 IL App (1st) 131873, ¶ 14), supported a conclusion defendant intended to kill Samuel. Defendant pointed a loaded gun at the back of Samuel's head at close range and pulled the trigger. It is difficult to imagine what outcome other than killing Samuel defendant could have intended.

¶ 57 Defendant cites writings of Professor George Yancy to explain the impact the racial slur at issue has upon African-Americans. Defendant did not introduce this evidence at trial, and it is not part of the record on appeal, so we cannot consider it. See *Magee*, 374 Ill. App. 3d at 1030. To the extent defendant suggests he was motivated by being called this racial slur, that is irrelevant,

because motive is not an element of attempted first degree murder. See *Viramontes*, 2017 IL App (1st) 142085, ¶ 52. Thus, the evidence was sufficient to support a conclusion defendant had intent to kill, and we affirm his conviction for attempted first degree murder.

¶ 58    Finally, defendant raises the defense of "impossibility," arguing he is not guilty of attempted first degree murder because the gun was unable to fire. Impossibility is not a defense to attempted murder, as we explained in *People v. English*, 334 Ill. App. 3d 156, 166 (2002):

> "Defendant's argument that he could not be convicted of attempted murder with an inoperable weapon is without merit. Section 8–4(b) of the Criminal Code of 1961 (720 ILCS 5/8–4(b) (West 1996)) provides that impossibility may not be a defense to a charge of attempt and this court has rejected impossibility as a defense to attempted murder. See *People v. Spiezio,* 191 Ill. App. 3d 1067, 1073 * * * (1989);" see also 720 ILCS 5/8-4(b) (West 2016) ("It is not a defense to a charge of attempt that because of a misapprehension of the circumstances it would have been impossible for the accused to commit the offense attempted.")

Accordingly, defendant's conviction for attempted first degree murder is affirmed.

¶ 59    Defendant also challenges the sufficiency of the evidence supporting his convictions for home invasion. Defendant was charged with home invasion under section 5/19-6(a)(3) of the Criminal Code of 2012, which provides that:

> "A person who is not a peace officer acting in the line of duty commits home invasion when without authority he or she knowingly enters the dwelling place of another when he or she knows or has reason to know that one or more persons is present * * * and * * * [w]hile armed with a firearm uses force or threatens the imminent use of force upon any

person or persons within the dwelling place whether or not injury occurs." 720 ILCS 5/19-6(a)(3) (West 2016).

Defendant argues the State introduced no evidence he was not a peace officer acting in the line of duty.

¶ 60    The requirement a defendant not be a peace officer acting in the line of duty is a material element of home invasion. *People v. Davis*, 106 Ill. App. 3d 260, 266 (1982). However, this element may be satisfied by proving a defendant's acts lie clearly outside the line of duty of a peace officer, rather than affirmatively proving a defendant is not a peace officer. *People v. Jones*, 157 Ill. App. 3d 106, 120-21 (1987). The State can establish this element through circumstantial evidence by presenting evidence a defendant's conduct was contrary to how a police officer might act. *People v. Simpson*, 2015 IL App (1st) 130303, ¶ 47.

¶ 61    The State introduced sufficient circumstantial evidence from which a rational trier of fact could conclude defendant was not a peace officer acting in the line of duty. The evidence established defendant was an uninvited attendee at the Garland brothers' party. He was wearing a white T-shirt and jeans, and later a black hoodie, not a law enforcement uniform. He never claimed to be a police officer or displayed a badge, a warrant, or any other indicia of law enforcement authority. On the contrary, defendant threatened to kill everyone at the party, hardly what one would expect a police officer to do in response to a verbal insult. Outside the house, multiple witnesses saw defendant retrieve a hoodie and a gun from a Range Rover, not a police vehicle. This was captured on the surveillance video recordings as well. Inside the house, defendant pointed a gun at the unarmed Samuel and attempted to shoot him in the back of the head for no apparent reason. All of defendant's actions were contrary to how a police officer would be expected to act,

and thus, a rational factfinder could conclude he was not a peace officer acting in the line of duty. See *Simpson*, 2015 IL App (1st) 130303, ¶ 48 (evidence a defendant broke into a house and pointed a gun at victim's head established defendant was not a peace officer sufficient to support home invasion conviction). Accordingly, we affirm defendant's convictions for home invasion.

¶ 62    For the foregoing reasons, we affirm defendant's convictions for attempted first degree murder and home invasion.

¶ 63    Affirmed.