2025 IL App (1st) 232462-U

SECOND DIVISION
February 11, 2025

No. 1-23-2462

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| HSBC BANK USA, N.A. as Trustee for Wells Fargo Asset Securities Corporation Home Equity Asset-Backed Certificates, Series 2006-3, | ) ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 07 CH 21012 |
| CHIQUITA MAHON, | ) ) | Honorable William B. Sullivan, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

PRESIDING JUSTICE VAN TINE delivered the judgment of the court.
Justices McBride and Howse concurred in the judgment.

**ORDER**

¶ 1    ***Held*:**  The circuit court did not err in finding that the conveyor's signature was forged in a deed that purported to transfer real property to another individual. Because the signature was forged, the property did not transfer, and the subsequent mortgage that the conveyor executed against the same property was valid.

¶ 2 In 1994, Chiquita Mahon and Bobby Binion (not a party to this appeal) jointly purchased real estate property. In 2001, Binion purportedly transferred his interest in the property to Mahon through a warranty deed. In 2006, Binion executed a mortgage against that same property. In 2007, Binion defaulted on the loan, and the lender, HSBC Bank USA (HSBC), filed a complaint against him seeking to foreclose the mortgage. In 2014, Mahon intervened in the litigation and sought to void the mortgage by claiming that Binion did not have an interest in the property when he executed the 2006 mortgage because he transferred his interest to Mahon in 2001. In 2015, Mahon filed a counterclaim seeking a declaratory judgment that (1) she was the sole owner of the property from 2001 onward, and (2) the 2006 mortgage was void or voidable. In 2018, HSBC filed its second amended complaint to add Mahon as a defendant and include a claim for an equitable lien against the property. In 2019, the circuit court entered judgment in favor of HSBC, finding that the 2001 property transfer was fraudulent because Binion's signature was forged. Accordingly, Binion retained his interest in the property at the time he executed the 2006 mortgage, and therefore, the mortgage was valid as to both Binion and Mahon. Mahon appeals. For the following reason, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4 The operative complaint in this appeal is HSBC's two-count second amended complaint, which it filed on October 26, 2018. HSBC brought count I, mortgage foreclosure, against Binion, Mahon, and others. HSBC alleged that Binion executed a mortgage against the subject property on August 18, 2006, and defaulted on the monthly mortgage payments beginning in April 2007. HSBC requested the court enter a judgment of foreclosure and sale, and an order granting it possession of the property. Under count II, brought in the alternative, HSBC sought an equitable lien against Mahon, alleging that it had paid property taxes and hazard insurance from April 2007

onward. HSBC alleged that Mahon, as an individual with an interest in the property, was unjustly enriched in the amount of $108,499.01. Thus, HSBC requested a lien for this amount if Mahon would be successful in voiding the 2006 mortgage, as it would have no adequate remedy at law. On November 20, 2018, Mahon answered the second amended complaint. As to count I, Mahon denied that the mortgage was valid and legally enforceable. She admitted being the current owner of the property. Mahon did not respond substantively to the allegation that she would be unjustly enriched by HSBC's payment of taxes and insurance. On December 5, 2018, the court set the matter for a bench trial.

¶ 5                                     A. Trial Testimony

¶ 6     The central issue at trial was whether Binion signed the 2001 warranty deed. Mahon's only witness was herself, as the court had stricken her proposed expert prior to trial. The court's decision to strike Mahon's expert is not at issue here. HSBC called two fact witnesses and Diane Marsh, a forensic document examiner. The two fact witnesses' testimony is also not at issue in this appeal. Binion did not testify. Mahon challenges the court's determination as to her credibility and Marsh's qualifications and methodology. Accordingly, we review only Mahon's and Marsh's trial testimony.

¶ 7                                     1. Chiquita Mahon

¶ 8     On direct examination, Mahon explained that she had a long romantic and professional relationship with Binion, predating the 1994 purchase of the subject property. She averred having ended her relationship with Binion in both 2001 and 2007, and that she was in a relationship with him in 2011. She testified that she believed that her name had been on the title of the subject property since 2001. She stated that she personally observed Binion sign the 2001 warranty deed, remembered the notarization of the deed, and was familiar with Binion's signature. She executed

a reverse mortgage on the property in 2017. On cross-examination, Mahon was asked about deposition testimony she gave in May and July 2017. Mahon confirmed that she had testified during those prior depositions that she was not familiar with Binion's signature, and did not know whether his signature was on the 2001 deed. On redirect, Mahon stated that now that she had reviewed the documents again she realized that she "did know these documents and [she] was familiar with these documents." She testified that she knew she was familiar with these documents because she was "there when [Binion] signed the Warranty Deed."

¶ 9 On cross-examination, Mahon admitted that she provided different years for when her relationship with Binion ended, but did not explain the discrepancies. She also admitted to providing different times regarding when Binion moved out of the subject property.

¶ 10                                   2. Diane Marsh

¶ 11 HSBC called Marsh to testify as an expert witness as to whether the signature on the warranty deed was Binion's. Marsh described herself as a forensic document examiner, having been involved in the study of questioned documents for 37 years. She has worked for banks, law firms, corporations, insurance companies, security firms, public defenders, prosecutors, and government entities. She had testified more than 200 times in state and federal courts. She belonged to several document examiner organizations, including the Independent Association of Questioned Document Examiners and the World Association of Document Examiners, and lectured at some of them. She received specialized training under two forensic document examiners, attended 70 training seminars, and engaged in over 4,800 hours of self-study. She has written 25 articles on questioned documents. On cross-examination, opposing counsel elicited testimony that Marsh did not become a full-time document examiner until 1990 (meaning she had 28 years of full-time experience rather than 37); did not become certified by the American Board

of Forensic Document Examiners; studied under individuals who may have been graphoanalysts rather than document examiners; and has only been a self-employed document examiner (rather than working in a supervised environment).

¶ 12     As to her methodology, Marsh testified having used the American Society for Testing and Materials International's guidelines to determine whether Binion's signature was authentic. She described her methodology in detail. Marsh received a copy of Binion's voter registration records from the Chicago Board of Election Commissioners. The signature on those reecords was the starting point of her analysis. Rather than paraphrasing Marsh's description of her methodology that followed, we reproduce it here:

> "I first examined all of the known [samples of Binion's handwriting] to see if they were all signed by the same person. If they were consistent with each other. And I did determine they were all written by the same person. All the handwriting [samples]. And then I examined the [2001 warranty deed], the signature on it. I went through. I examined it with my microscope. And after I did a thorough examination of the signature on the warranty deed, then I did a side-by-side comparison. I went through each handwriting characteristic in the known [samples] in comparison to the handwriting characteristics in the questioned signature. And After I did all that, then I was able to arrive at an opinion.
>
> \*\*\*
>
> My opinion is that the person that wrote the known exemplars, Bobby Binion, is not the same individual that signed the [warranty] deed, the questioned signature.
>
> \*\*\*
>
> My conclusions are based on a number of fundamental differences that exist between the questioned signature and the known signature. And some of these are beginning strokes,

spacing, letter design, slant, connecting strokes, ending strokes, that are fundamentally different from the known signatures in comparison to the warranty deed signature."

Based on this methodology, Marsh concluded that Binion did not sign the warranty deed.

¶ 13    On cross-examination, opposing counsel elicited testimony that Marsh used enlarged photocopies of the samples rather than an original signature sample; photocopies are not as reliable as originals; and there was variation among the samples that Marsh analyzed.

¶ 14                                    B. The Trial Court's Decision

¶ 15    On May 21, 2019, the court issued a detailed written opinion and order in favor of HSBC. The court explained that the key issue in the case was whether the signature on the 2001 warranty deed was in fact Binion's. As relevant here, the court believed that Mahon attempted to testify in good faith but found her not credible because of the significant inconsistences between her testimony at trial and prior deposition testimony. Most notably, the court emphasized that, on direct examination, Mahon stated on several occasions that she was familiar with Binion's signature and that she specifically remembered eye witnessing Binion sign the 2001 warranty deed. On cross-examination, she admitted that she testified under oath at her July 2017 deposition that she did not know if Binion's signature was on the warranty deed and that she was not familiar with Binion's signature. Because of this inconsistency, the court did not rely on Mahon's testimony.

¶ 16    Further, the court found Marsh's qualifications and methodologies sufficient to allow her to testify as an expert witness. As to her qualifications, the court noted that Marsh has been (1) certified by several reputable and professional document examiner organizations; (2) qualified as an expert by state and federal courts in Illinois; (3) involved in the study of questioned documents for 37 years, having worked for banks, law firms, corporations, insurance companies, security firms, prosecutors, public defenders, and other governmental entities; (4) trained by two certified

forensic document examiners; (5) an attendee at more than 70 individual training seminars (for a total of 1,800 hours); and (6) engaged in substantial self-study totaling over 4,800 hours. However, the court also noted that Marsh (1) has only ever been a self-employed document examiner and has never worked in a supervised environment; (2) is not a member of, nor certified by, the American Board of Forensic Document Examiners; and (3) did not become certified by the American Board of Forensic Document Examiners because she did not complete two years of full-time training under a governmental agency. Based on a holistic consideration of the foregoing, the court concluded that Marsh was qualified to serve as an expert witness.

¶ 17    The court found Marsh's methodology credible. It stated that another Illinois court found Marsh's testimony to be "extremely credible, thoroughly articulated, and well supported." The court noted that Marsh testified in detail regarding the processes she undertook in analyzing the handwriting and signatures. The court explained that the potential shortcomings of Marsh's methodology, such as using enlarged photocopies rather than originals in her analysis and having fewer than an optimal number of signatures samples, were minimal and therefore insufficient to disqualify her expert testimony. The court found that the 2001 signature purported to be Binion's was forged.

¶ 18    On August 6, 2019, the court entered the judgment for foreclosure and sale. On June 5, 2023, it entered an order approving HSBC's report of sale and distribution. On June 26, 2023, Mahon petitioned the court to set aside the sale and moved to stay the eviction. The court denied Mahon's petition and motion.

¶ 19    Mahon appeals.

¶ 20                                                    II. ANALYSIS

¶ 21    On appeal, Mahon argues that the circuit court erred in concluding that the 2001 warranty deed was forged because (1) Mahon offered "uncontroverted eyewitness testimony" that she witnessed Binion sign the deed, and (2) HSBC's handwriting expert lacked the requisite qualifications and used a faulty methodology in forming her opinion.

¶ 22    At the outset, we note that Mahon does not identify the applicable standard of review on appeal. Illinois Supreme Court Rule 341(h)(3) requires the appellant to include a "concise statement of the applicable standard of review for each issue, with citation to authority, either in the discussion of the issue in the argument or under a separate heading placed before the discussion in the argument." Ill. S. Ct. R. 341(h)(3) (eff. Oct. 1, 2020). Second, Mahon does not include a jurisdictional statement as required by Rule 341(h)(4). Ill. S. Ct. R. 341(h)(4) (eff. Oct. 1, 2020). Third, Mahon does not include citations to the record on appeal as required by Rule 341(h)(6). Ill. S. Ct. R. 341(h)(6) (eff. Oct. 1, 2020). Finally, Mahon does not support her arguments with citation to relevant authority as required by Rule 341(h)(7). Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020).

¶ 23    Our supreme court rules are not mere suggestions; they have the force of law, and the parties must abide by them. *Rosestone Investments, LLC v. Garner*, 2013 IL App (1st) 123422, ¶ 18. We have the inherent authority to dismiss an appeal where the appellant's brief fails to comply with supreme court rules. *North Community Bank v. 17011 South Park Avenue, LLC*, 2015 IL App (1st) 133672, ¶ 14. However, we recognize that dismissing an appeal or striking a brief is a harsh sanction. *In re Detention of Powell*, 217 Ill. 2d 123, 132 (2005). Although Mahon's noncompliance with our supreme court rules complicates our review, it does not frustrate it completely, so we will supply the standard of review and consider the merits.

¶ 24   The standard of review following a bench trial is whether the trial court's order or judgment is against the manifest weight of the evidence. *Wade v. Stewart Title Guaranty Company*, 2017 IL App (1st) 161765, ¶ 59. "A decision is against the manifest weight of the evidence only when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence." (Internal quotation marks omitted.) *Id.* (quoting *Eychaner v. Gross*, 202 Ill. 2d 228, 252 (2002)). Under this standard, we afford great deference to the trial court because it is in the best position to determine and weigh the credibility of the witnesses, observe their demeanor, and resolve conflicts in their testimony. *Id.* (citing *People v. Jones*, 215 Ill. 2d 261, 268 (2005)).

¶ 25   In this case, the court was required to decide whether the signature on the 2001 warranty deed was authentic or forged. A forgery is a false writing or alteration of a writing, which must be capable of defrauding, and there must be an intent to defraud. *In re Estate of Bontkowski*, 337 Ill. App. 3d 72, 76 (2003). A party alleging forgery of a notarized document must prove its allegation by clear and convincing evidence from a disinterested witness. *Id.*; *Finley v. Felter*, 403 Ill. 372, 378 (1949). "Clear and convincing" evidence is the level of proof that leaves no reasonable doubt in the mind of the factfinder as to the truth of the proposition. *Bazydlo v. Volant*, 164 Ill. 2d 207, 213 (1995).

¶ 26   Here, Mahon challenges the court's determination that the 2001 warranty deed was forged because, according to Mahon, she was a credible, uncontroverted witness, and Marsh was not qualified to testify as an expert.

¶ 27                    A. Credibility of Mahon's Testimony

¶ 28   Mahon argues that her testimony of witnessing Binion sign the 2001 warranty deed was "uncontroverted and unimpeached" and that the court erred in finding her not credible. This

assertion is inaccurate. When questioned about witnessing Binion sign the deed on cross-examination, Mahon answered as follows:

"Q. Now, you testified that you personally witnessed Bobby Binton [*sic*] sign this Warranty Deed, correct?

A. Yes.

Q. But you previously testified that you don't recall ever seeing this document, correct?

A. Yes."

Based on the foregoing, it is unclear to this court how Mahon could contend that her testimony regarding whether she witnessed Binion sign the 2001 deed was uncontroverted and unimpeached. Mahon also testified that she was familiar with Binion's signature. However, at a prior deposition, she stated she did not know his signature. Additionally, HSBC specifically identifies several other portions of Mahon's testimony that impeached her credibility.

¶ 29    Mahon cites *Jones v. Jones*, 406 Ill. 448 (1950), to suggest that the circuit court should have relied on her testimony. In that case, the court discounted the expert's opinion where two disinterested witnesses' uncontradicted testimony showed that the testatrix signed the will in question. *Id.* at 451. Mahon's reliance on that case is misplaced for two reasons. First, she is not a disinterested witness, as her liability for damages hinges on whether the 2001 conveyance was valid. Second, her testimony was contradicted, as shown above. Mahon also cites *Fekete v. Fekete*, 323 Ill. 468 (1926), for the proposition that expert opinions on handwriting are of little value if they are "mere opinions." While that may be true, it has nothing to do with Mahon's contention that the court erred in finding her not credible. The court did not err in finding Mahon not credible, as her testimony was inconsistent regarding the threshold issue of whether Binion signed the deed.

¶ 30                    B. Diane Marsh's Expertise

¶ 31    As noted above, HSBC retained Diane Marsh, a forensic document examiner, as its expert witness to determine whether the signature on the 2001 warranty deed was actually Binion's. Mahon challenges Marsh's opinion on two grounds: (1) her qualifications, and (2) her methodology.[1]

¶ 32                    1. Marsh's Qualifications

¶ 33    As an initial matter, we note that the decision whether to admit expert testimony is within the sound discretion of the trial court. *Thompson v. Gordon*, 221 Ill. 2d 414, 428 (2006). A court will allow a person to testify as an expert if her experience and qualifications afford her knowledge that is not common to laypeople, and where her testimony will aid the trier of fact in reaching its conclusions. *Id.* "An expert whose qualifications and experience give him or her knowledge which is beyond the ken of the average fact finder and whose testimony will aid, and not invade, the province of the fact finder in reaching its decision, should be allowed to testify." *People v. Masor*, 218 Ill. App. 3d 884, 887 (1991). "There is no predetermined formula for how an expert acquires specialized knowledge or experience and the expert can gain such through practical experience, scientific study, education, training or research." (Internal quotation marks omitted.) *Thompson*, 221 Ill. 2d at 428-29 (quoting *People v. Miller*, 173 Ill. 2d 167, 186 (1996)). Formal academic training or specific degrees are not required to qualify a person as an expert; rather, practical experience in a field may suffice. *Id.* at 429. An expert must only have knowledge beyond

---

[1]It appears that Mahon challenges the content of Marsh's opinion based on lack of qualifications and faulty methodology. She does not appear to challenge the admissibility of Marsh's testimony. In any case, we would review admissibility under an even more deferential standard, abuse of discretion, and as explained below, Marsh was qualified to testify as an expert. *In re Commitment of Simons*, 213 Ill. 2d 523, 530-31 (2004) (stating that the decision as to whether an expert witness is qualified to testify is in the sound discretion of the trial court).

that of an average person. *Id.* Accordingly, expert testimony is admissible "if the proffered expert is qualified by knowledge, skill, experience, training, or education, and the testimony will assist the trier of fact in understanding the evidence." (Internal quotation marks omitted.) *Id.* (quoting *Snelson v. Kamm*, 204 Ill. 2d 1, 24 (2003)).

¶ 34     At the time of trial, Marsh had worked in the study of questioned documents for 37 years. She trained under two certified forensic document examiners, attended more than 70 individual training seminars for a combined total of 1,800 hours, and over 4,800 hours of self-study. She passed examinations with the Association of Forensic Document Examiners, the Independent Association of Forensic Document Examiners, the American Board of Forensic Examiners, and the World Association of Document Examiners. She is board certified by the Independent Association of Questioned Document Examiners, the World Association of Document Examiners, and the American Board of Forensic Examiners. Marsh is a member of the Association of Forensic Document Examiners, the American Society for Testing and Materials International, the Illinois Association for Identification, and the American College of Forensic Examiners. In another mortgage fraud case, this court declined to disqualify Marsh as a handwriting expert, noting that the trial court in that case found Marsh's testimony "extremely credible, thoroughly articulated, and well-supported." *Gambino v. Boulevard Mortgage Corp.*, 398 Ill. App. 3d 21, 48 (2009).

¶ 35     Mahon contends that Marsh is unqualified because she (1) received her training under graphoanalysts, (2) has never trained in a government or laboratory setting, and (3) gained certification by two organizations that later became defunct. Mahon does not cite to any authority to support that any of these three contentions render Marsh unqualified to testify as an expert.

¶ 36    As to Mahon's first contention, she argues that Marsh conceded that she did not train under two certified document examiners but rather graphoanalysts.[2] This contention has no merit, as the record shows that Marsh explained, on cross-examination, as follows:

"Q. And Ms. Schneider and Ms. Garage are what are called graphoanalysts, correct?

A. No. They were forensic document examiners. They were both certified as forensic document examiners by the Independent Association of Questioned Document Examiners.

Q. So, you're saying that these ladies were never graphoanalysts. Is that your testimony?

A. They may have studied graphoanalysts[*sic*] at one time but they – in 1969 when the Independent Association of Questioned Document Examiners was formulated, they were both charter members of that group."

As Mahon's contention is wholly contrary to the evidence on the record, we must reject it.

¶ 37    Taken together, Mahon's second and third contentions are essentially a challenge to Marsh's certifications by three organizations. First, Mahon contends that, because Marsh is not certified by the American Board of Forensic Document Examiners, she is unqualified. As an initial matter, Mahon does not cite any authority to suggest that certification by this particular organization is a threshold requirement for qualifying an individual as an expert in this field. Further, Mahon argues that Marsh could not qualify under the standards of that organization because it requires two years of full-time training. However, as Marsh explained, that organization also accepts the equivalent of two years of full-time training. As we noted above, Marsh logged at least 6,600 hours of seminars and self-study, which could very well exceed two years of full-time training. As Marsh explained, she was not certified by that organization because she never applied

_____

[2]According to Marsh, graphoanalysts are individuals who analyze handwriting to gain insight into one's personality; they do not compare and analyze handwriting samples.

for certification, not because she necessarily fell short of its standards. Therefore, we will not assume Marsh would not have been certified if she had applied, as Mahon seems to urge us to do.

¶ 38     Second, Mahon takes issue with Marsh's certifications by two other organizations, the Independent Association of Questioned Document Examiners and the World Association of Document Examiners, because they are no longer active. Mahon does not dispute that Marsh is certified by both organizations. Rather, she appears to argue that Marsh's certification under now-inactive organizations somehow disqualifies Marsh. We are unsure what the relevance of these organizations' inactive status is, as Mahon does not challenge the standards that these organizations used while they were active to certify individuals.

¶ 39     To receive The Independent Association of Questioned Document Examiners' certification, Marsh had to show she completed the equivalent of at least three years of full-time training. To qualify under the World Association of Document Examiners, she was required to pass an examination and appear before that organization's board for questioning as she presented a document case. Even assuming for the sake of argument that certification by the American Board of Forensic Document Examiners was somehow a threshold requirement for qualification as an expert, the requirements Marsh had to fulfill for certification by the other two organizations (the equivalent of three years' full-time training and examinations) exceeded what would have been required by the American Board of Forensic Document Examiners (two years of full time-time training and examination). Clearly, Marsh's background indicates that she has knowledge beyond the ken of the average factfinder. Accordingly, we hold that the trial court's decision to admit Marsh as an expert was wholly supported by the evidence.

¶ 40                                   2. Marsh's Methodology

¶ 41    In Illinois, the *Frye* standard governs the admission of expert testimony. *In re Commitment of Simons*, 213 Ill. 2d 523, 529 (2004) (citing *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923)). Also known as the "general acceptance" test, the *Frye* standard provides that scientific evidence is admissible only if the methodology or scientific principle upon which the opinion is based has gained general acceptance in the particular field in which it belongs. *Id.* at 529-30. This does not require universal acceptance nor that the methodology in question be accepted by unanimity or even a majority of experts. *Id.* at 530. Rather, it is sufficient that the underlying method used to generate an expert opinion is reasonably relied upon by experts in the field. *Id.*

¶ 42    Marsh examined several samples of Binion's handwriting, including his signatures on two quit claim deeds, four mortgages, an affidavit, an occupancy declaration, and voter registration records. She determined that all were written by the same person and consistent with each other. She examined the 2001 deed under a microscope and compared it side-by-side with these samples. She "went through each handwriting characteristic in the known samples in comparison to the handwriting characteristics in the questioned signature." Based on this comparison and analysis, Marsh concluded that the signature on the 2001 deed was not Binion's.

¶ 43    Mahon contends that Marsh utilized a faulty methodology in that she (1) used photocopies to evaluate the signature on the 2001 deed, (2) enlarged the documents she used in her analysis, and (3) failed to use "requested writing samples." Again, Mahon fails to cite any authority in support of these contentions.

¶ 44    As to Mahon's first contention, we note that Marsh used photocopies of Binion's signature samples rather than Binion's original signature. HSBC states that there was no practical way to obtain an original signature because Binion did not participate in the trial or litigation. Mahon takes issue with the use of photocopies because Marsh testified that the American Board of

Forensic Examiners' guidance provides: "Photocopies pose an inherent limitation that can interfere with the examination procedure." That is, photocopies *can* interfere with the examination procedure, but there is no indication that they inherently do so. Here, Mahon does not argue that the photocopies interfered with the examination process, let alone explain how they interfered. This is likely because Marsh testified that the photocopies were both "clear" and "very legible." She also testified that the photocopies were likely first- or second-generation copies based on their clarity. Because Mahon has not argued anything contrary to Marsh's testimony that the photocopies were clear and very legible, we find no reason to call into question Marsh's use of photocopies in her analysis.

¶ 45    Mahon also takes issue with Marsh enlarging the photocopies. We are unclear where this allegation originates, as it, again, directly contradicts Marsh's testimony, which provided that her "specific findings were based on the actual photocopies themselves, and not based on [her] enlargement." Because Mahon's argument is again based on a misstatement of the record, we find her challenge entirely meritless.

¶ 46    Lastly, Mahon argues that Marsh's methodology was unsound because Marsh did not collect or have access to Binion's writing samples that were requested for this litigation. Mahon contends that this was problematic because a person's handwriting is "ever changing." Even assuming that this unsupported contention is true, the record indicates that Marsh analyzed more than 30 samples of Binion's signatures over a "long period of time." Although Marsh did not have access to newly requested samples, her analysis relied on signature samples from the time of the deed, as well as an extended period of time thereafter. Accordingly, we hold that the evidence showed that Marsh employed a sound methodology in reaching her opinion, and the trial court did not err in admitting her testimony.

¶ 47    As the evidence amply supported the trial court's judgment, it was certainly not against the manifest weight of the evidence.

¶ 48                                    III. CONCLUSION

¶ 49    For these reasons, we affirm the judgment of the circuit court of Cook County.

¶ 50    Affirmed.